STATE OF CONNECTICUT *v.* GERALD MIGLIARO
(10074)

NORCOTT, HEIMAN and FREEDMAN, Js.

Argued May 12—decision released July 28, 1992

*Robert M. Casale,* with whom, on the brief, was *Catherine Browning,* law student intern, for the appellant (defendant).

*Carolyn K. Longstreth,* assistant state's attorney, with whom were *Elpedio Vitale,* assistant state's attorney, and, on the brief, *Michael Dearington,* state's attorney, for the appellee (state).

HEIMAN, J. The defendant appeals from a judgment of conviction, rendered after a jury verdict, of criminally negligent homicide in violation of General Statutes § 53a-58,[1] and risk of injury to a child in violation of General Statutes § 53-21. He claims that the trial court violated his state and federal constitutional rights when it failed (1) to conduct an adequate inquiry into whether any jurors improperly relied on medical books brought to court by one of the jurors, and (2) to declare a mistrial because of the potential juror misconduct. We remand the case for an evidentiary hearing regarding potential juror misconduct.

The jury could reasonably have found the following facts. On October 8, 1989, the defendant dialed 911 and reported that Anna, his twelve week old daughter, was not breathing. Emergency medical personnel were dispatched immediately to the defendant's house, where

---

[1] The defendant originally was charged with manslaughter in the first degree in violation of General Statutes § 53a-58. Criminally negligent homicide was in this case a lesser included offense of manslaughter in the first degree.

they found the victim lying on the floor at the foot of a set of stairs. A paramedic observed that the victim's hands and lips had a bluish tinge and that her breathing was irregular. They concluded that the irregular breathing pattern was consistent with Cheyne-Stokes type respiration, a sign of brain injury. They also noted a red mark of unknown origin on her forehead. Her pulse rate was normal.

The defendant was present when the emergency medical personnel arrived. When asked what had happened, the defendant replied that the victim had been in her crib screaming and that when he went up to check on her, she stopped breathing. He further stated that he performed cardiopulmonary resuscitation on her. The defendant claimed that he had no idea how the victim got to the bottom of the stairway.

While still at the defendant's house, the paramedics inserted a tube into the victim's windpipe to assist her breathing. This was difficult because the victim's tracheal opening was so narrow. Once the victim was intubated, however, her skin became pinker, and she was brought by ambulance to Yale-New Haven Hospital. During the trip, the defendant, who accompanied the victim in the ambulance, appeared to be distraught.

At the hospital, the victim was taken to a trauma room, where she was treated by hospital personnel. The endotracheal tube still was in place and the victim appeared to be breathing in a normal pattern. Some concern was expressed regarding whether the tube had been placed in her esophagus, a circumstance that could have caused the victim's respiration to become compressed. The endotracheal tube, however, began to loosen and was removed. The victim's breathing again became labored, she was reintubated and doctors suctioned a small amount of what appeared to be baby formula from her trachea. The victim then was placed in

the pediatric intensive care unit, where she died forty hours after being picked up by the emergency medical personnel.

At the time of her two month pediatric checkup, the victim was in normal physical condition. On the night of the occurrence, however, the defendant told the victim's pediatrician, who had come to the hospital, that she had vomited just before she had stopped breathing. The principal issue at trial was the cause of the victim's death. The state produced expert medical testimony indicating that the victim died as the result of a head injury caused by abuse, or shaken baby syndrome. The defendant produced an expert medical witness who opined that the victim died not from a traumatic brain injury but from either an inadequate supply of blood to her brain or an insufficiently oxygenated supply of blood to her brain, which in turn caused some of her brain tissue to die. The victim's pediatrician testified that his physical examination of her on the night of the occurrence disclosed no signs of bruises or other external injuries. Thus, the verdicts in this case necessarily were driven by the resolution of conflicting medical evidence.

The jury commenced its deliberations on January 28, 1991. Late that afternoon and again the next day, the jury sent the trial court a series of notes requesting reinstruction on certain elements of the offenses charged. The next morning, the trial court reinstructed the jury in accordance with its initial request, and reminded the jury that it was to decide the case only on the evidence presented in the courtroom. On the morning of January 29, 1991, when the jurors returned to resume their deliberations, one of the jurors brought two medical books with her, which apparently were taken by a courtroom clerk before the juror entered the deliberation room. How the books came to the attention of either the clerk or the trial court is unclear.

After the trial court concluded its supplementary instruction, the following colloquy took place between Robert Casale, the defendant's attorney, Elpedio Vitale, the prosecutor, and the trial court regarding this incident.

"Mr. Casale: Judge, I would ask you just—We know that the juror dropped off a couple of medical books on the way. We just don't know if they were relied upon by that juror in any respect over the previous evening, and it's a delicate matter. And in that I don't know what the proper way to handle this is, I would imagine at this point forward the juror has been properly admonished to rely upon solely what has taken place in the courtroom. We don't know what may have taken place last night, since, as I say, the juror did come in armed with formidable medical texts this morning.

"Mr. Vitale: Mr. Casale calls them 'formidable.' They look like home health books that someone could purchase at a pharmacy. There's no evidence—Yesterday they were not in the courtroom for part of the jury deliberations; certainly, they are not today. So it's simply speculation on Mr. Casale's part. Chances are the juror was not aware of the fact she couldn't do that when she brought them in. And she was apprised of the fact they could not be utilized so she dropped them off.

"The Court: Certainly my guess would be she was told by someone probably upstairs that she certainly couldn't carry these into the jury room with her and she left them with the clerk. And that of course is why I gave that last admonishment, and I am confident that nothing will be made of anything that she might have read in the books. And I hate to single her out and bring her out there and then by doing that of course everyone is going to wonder why she's been brought out alone and admonished. It may have been given to her

and curiosity might lead into an area that we don't want them to go into. And I frankly feel that in advising all of them that they could not base their decision on anything other than what they heard here in this courtroom, that they will confine their deliberations to that evidence that they heard here in the courtroom and only to that evidence.

"So, is there something that you're asking me to do?

"Mr. Casale: The great difficulty of course is we don't know what this juror may have learned on her own last night. And if she has acquired some independent information and that's part of the deliberation, the deliberation process being secret, we'd never know. There's no way to get at that.

"The defendant is in a difficult position. Really, the only alternative that I know of under the statute is to move for a mistrial, and for the reasons stated that's the only thing we can do to seek to protect ourselves under the circumstances.

"It's a funny thing because I don't know the information in those books, if any, was acquired and it could be fatal, it could be negative to us, it's not something we could ever know. With that caveat in mind, I think the defendant is constrained to move and we would so move.

"The Court: In that you are moving for a mistrial— let me get the book that is in question so we can make some record of what it is exactly. All right. Let the record indicate that the juror dropped off with the clerk something called, 'The Second Edition of the Complete Guide to Symptoms, Illness, and Surgery' written by H. Winter Griffith, M.D., published by the Body Press with a copyright date of 1985. The other is 'The Sixth Edition of The Complete Guide to Prescription and

Nonprescription Drugs' by the same author, same press, with a copyright date of 1983. Did you wish to be heard before I make a ruling?

"Mr. Vitale: Only Mr. Casale's comments about we don't know what goes on in the jury room applies to any case. We can only presume that the jurors are going to follow the court's instructions about what they are to consider when reaching a verdict. Other than that, I have nothing else to say, Judge.

"The Court: And I would agree with your analysis. We must presume that the jurors' acts are in accordance with the instructions and the tenets of the oath. The mere fact that the books were dropped off rather than taken into the jury room indicates to me that especially after my cautionary instruction that nothing amiss can or will happen in the jury room. Your motion is, therefore, denied.

"Mr. Casale: Exception, please.

"The Court: Exception may be noted."

No evidence was taken as to whether the juror who brought the books to court had read them or whether the books contained any text that might be viewed as pertinent to the issues in the case. The jury returned verdicts as indicated previously.

The defendant claims that the trial court violated his state and federal constitutional rights when it failed to conduct an adequate inquiry into whether any jurors improperly had relied on the medical books brought to court by one of the jurors.[2]

---

[2] Because the defendant has not provided an independent analysis to support his state constitutional claim, we will not review it. Our Supreme Court and this court have declined to review a defendant's state constitutional claim, deeming it to have been abandoned, when the defendant has not separately briefed and analyzed that claim. See, e.g., *State* v. *Hernandez,* 204 Conn. 377, 394 n.9, 528 A.2d 794 (1987); *State* v. *Redente,* 19 Conn. App.

" '[T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors.' *Irvin* v. *Dowd,* 366 U.S. 717, 722, 81 S. Ct. 1369, 6 L. Ed. 2d 751 (1961)." *State* v. *Ziel,* 197 Conn. 60, 64, 495 A.2d 1050 (1985). A necessary component of the right to an impartial jury is the right to have the jury decide the case "solely on the basis of the evidence and arguments given them in the adversary arena after proper instructions on the law by the court." *State* v. *Rodriguez,* 210 Conn. 315, 325, 554 A.2d 1080 (1989). "Consideration of extrinsic evidence is jury misconduct and has been found to be sufficient to violate the constitutional right to trial by an impartial jury. See, e.g., *United States* v. *Winkle,* 587 F.2d 705, 714 (5th Cir. 1979)." *State* v. *McCall,* 187 Conn. 73, 80, 444 A.2d 896 (1982). Whether juror consideration of extrinsic evidence was prejudicial to a defendant depends on "the magnitude of the juror's deviation from his proper role, the degree to which the accused was deprived of the benefits of the constitutional and statutory safeguards, and the likelihood that the impropriety influenced the jury's verdict." *State* v. *Asherman,* 193 Conn. 695, 739, 478 A.2d 227, cert. denied, 470 U.S. 1050, 105 S. Ct. 1748, 84 L. Ed. 2d 814 (1984).

Although the trial court enjoys broad discretion in determining whether jury misconduct occurred, and, if so, whether such misconduct prejudiced the defendant; *State* v. *McCall,* supra, 77; *State* v. *Martinez,* 173 Conn. 541, 543–44, 378 A.2d 517 (1977); the court must have some factual basis on which to exercise that discretion. *State* v. *Gonzalez,* 25 Conn. App. 433, 439, 596

521, 531 n.5, 563 A.2d 1365 (1989); *State* v. *Thompson,* 17 Conn. App. 490, 498 n.5, 554 A.2d 297, cert. denied, 211 Conn. 803, 559 A.2d 1136 (1989). That declination, however, does not mean that we are not able to review such a claim if we choose to do so. *State* v. *Hoeplinger,* 27 Conn. App. 643, 652 n.2, 609 A.2d 1015 (1992); *State* v. *Geisler,* 25 Conn. App. 282, 283–84, n.2, 594 A.2d 985 (1991), aff'd, 222 Conn. 672, 610 A.2d 1225 (1992).

A.2d 443, cert. granted on other grounds, 220 Conn 928, 598 A.2d 1099 (1991). After all, "the trial judge is not simply a referee presiding over a forensic contest, but is a minister of justice . . . ." *State* v. *Lucci,* 25 Conn. App. 334, 341, 595 A.2d 361, cert. denied, 220 Conn. 913, 597 A.2d 336 (1991). Where it appears during the course of a trial that the jury panel may have been exposed to prejudicial extrinsic evidence, the trial court must conduct an investigation to determine whether jury misconduct occurred. *United States* v. *Anello,* 765 F.2d 253, 259 (1st Cir. 1985); *United States* v. *Griffith,* 756 F.2d 1244, 1252 (6th Cir.), cert. denied, 474 U.S. 837, 106 S. Ct. 114, 88 L. Ed. 2d 93 (1985); *United States* v. *Savage,* 701 F.2d 867, 871 (11th Cir. 1983); *United States* v. *Pomponio,* 517 F.2d 460, 463 (4th Cir.), cert. denied, 423 U.S. 1015, 96 S. Ct. 448, 46 L. Ed. 2d 386 (1975); *State* v. *Gonzalez,* supra, 440. "There is no magic formula that the trial court must follow in conducting this inquiry. Rather, it must use whatever inquisitorial tools are necessary and appropriate to determine whether there was a 'reasonable possibility' of prejudice." *United States* v. *Savage,* supra.

Here, the trial court was presented with sufficient indicia that at least one juror had been exposed to potentially prejudicial extrinsic evidence to trigger the trial court's duty to investigate the potential jury misconduct further. The trial court knew that a juror brought medical books into the courthouse. It also knew that medical evidence was critical to the jury's resolution of the issue of the cause of the victim's death, the primary and most hotly contested issue in the case. Despite this knowledge, the trial court failed even to attempt to ascertain whether that juror or any other juror had utilized information from the books during the course of deliberations. Additionally, the trial court failed to make even a rudimentary inquiry into the substantive contents of the books, in particular whether

the books contained any information that might be interpreted by the reader to be material to the issues in this case. "A basic factual inquiry into the substantive content of the alleged misconduct was required before the trial court could exercise its discretion in determining the scope or extent of any [further] investigation needed." *State* v. *Gonzalez,* supra.

Because the trial court failed to conduct the necessary inquiry into the potential juror misconduct, we are required to remand this case for a hearing to determine (1) whether either or both of the books contained information pertinent to the medical issues involved in this case, (2) if so, whether the juror who possessed the books used them to assist her in deciding any issue in this case, (3) if so, the extent to which that juror relied on the books, (4) whether that juror shared any information gleaned from the books with any of her fellow jurors, and (5) whether the defendant was prejudiced by any of the jurors' reliance on the information contained in the books. If the trial court determines that the books contained no information material to this case, that the books were not utilized by any juror or that no prejudice resulted from the jurors' use of the books, then the trial court may exercise its discretion with respect to the defendant's motion for mistrial.

The case is remanded to the trial court for further proceedings consistent with this opinion. If the trial court determines that the books were utilized by the jurors and that the defendant was prejudiced thereby, the judgment is set aside and a new trial is ordered. In the event that the trial court is unable to make the requisite factual findings because of witness unavailability or for other cause, the judgment is set aside and a new trial is ordered. In the event that the trial court denies the motion for mistrial and no timely appeal is taken from such denial, the judgment is affirmed.

In this opinion the other judges concurred.