STATE OF CONNECTICUT *v.* RAFAEL DELGADO
(14296)

Dupont, C. J., and Lavery and Freedman, Js.

Argued January 11—decision released July 30, 1996

*Francis J. DiScala* and *Francis J. DiScala, Jr.*, with whom, on the brief, was *John Thygerson*, for the appellant (defendant).

*Richard F. Jacobson*, assistant state's attorney, with whom, on the brief, were *Donald A. Browne*, state's attorney, and *Stephen J. Sedensky III*, assistant state's attorney, for the appellee (state).

FREEDMAN, J. The defendant appeals from the judgment of conviction, following a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1)[1] and risk of injury to a child in violation of General Statutes § 53-21.[2] On appeal, the defendant claims that the trial court improperly (1) allowed joinder of the manslaughter and risk of injury counts, (2)

---

[1] General Statutes § 53a-55 (a) provides in pertinent part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person. . . ."

[2] General Statutes § 53-21 provides: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

excluded the testimony of a defense expert witness due to an alleged violation of a sequestration order, (3) admitted evidence of prior injuries to the victim, and (4) allowed into evidence a videotape of the victim and her mother, a codefendant. The defendant also argues that the verdict was against the weight of the evidence and that the court's charge to the jury was misleading and confusing, resulting in the dilution of the state's burden of proof. We conclude that the evidence was sufficient to establish the defendant's guilt of the crimes charged. We agree, however, with the defendant with regard to the joinder of the manslaughter and risk of injury counts. Accordingly, we reverse the judgment and remand the case for a new trial.[3]

The jury reasonably could have found the following facts. The victim was a sixteen month old baby with Down's Syndrome who, at the time of her death on December 14, 1992, resided with her mother, Devilyn Bruno, and her mother's boyfriend, the defendant Rafael Delgado, in an apartment in Bridgeport. In the spring of 1992, the victim was taken by her aunt to live with her grandmother in Florida. The victim was returned to Connecticut in September or October of 1992. After the victim's return to Connecticut, the defendant inquired of the aunt when she was taking the victim back to Florida.

On November 16, 1992, the victim was seen at the St. Joseph's Family Medical Center in Stamford for her fifteen month checkup. The nurse on duty noticed that the victim had three bruises on her face, one on each temple area and one on the right cheek. When the nurse

---

[3] We address the defendant's claim regarding sufficiency of the evidence first since the defendant would be entitled to an acquittal if the evidence were, in fact, insufficient. In light of our conclusion that the trial court improperly consolidated the manslaughter and risk of injury counts, however, we need not address all of the defendant's remaining claims. See *State v. Coleman*, 41 Conn. App. 255, 257 n.6, 675 A.2d 887 (1996).

questioned Bruno about the bruises, Bruno responded that the victim had sustained the bruises when she fell out of a bouncing chair approximately three or four days earlier.

On the same day, Tammy Vargas, a family practice physician at St. Joseph's Family Medical Center, examined the victim. Vargas had previously examined the victim in April, 1992, at which time she did not notice any bruises on the victim or problems with the victim's arms or legs. During the examination on November 16, 1992, which was videotaped,[4] Vargas noticed some bruises on the victim's forehead and ordered blood work to rule out any bleeding abnormality. Bruno told Vargas that all of the victim's bruises were caused when the victim fell off of a bouncing chair. Bruno also told Vargas that the victim sometimes put her fingers in her nose causing nosebleeds. Vargas found no indication that the victim tended to bang her head or had a sleep disorder, and no indication that the victim had a broken right leg. Vargas had a "slight suspicion" of child abuse.

On December 8, 1992, Bruno had a conversation with Vargas in which she indicated that the victim had a swelling in her thigh. Bruno told Vargas that she thought the swelling was on the same side where the victim had received a shot. Vargas could not recall on what part of the body the shots were given, but according to the medical records, the victim did receive shots on November 16, 1992. Since Vargas did not see the victim after November 16, 1992, she did not know the cause of the swelling.

Regina Featherston, a nutritionist for Women, Infants and Children (WIC), a federally funded nutrition program for children and pregnant women, first saw the victim on February 26, 1992. On that date, Featherston did not notice any bruises on the victim and the victim

---

[4] The videotape was played for the jury.

allowed Featherston to pick her up and to hold her. Featherston next saw the victim on November 17, 1992. At that time, Featherston noticed bruises around the victim's forehead and on her cheeks. She also noticed a pattern of tiny cuts around the victim's eyes and black and blue marks on both sides of the victim's chin. Featherston asked Bruno about the victim's injuries and Bruno told her that the victim had fallen out of a rocking chair. When Featherston attempted to pick the victim up, the victim screamed and tried to get away from her. The victim had the same reaction when Bruno went to pick her up. Bruno explained to Featherston that the victim had behaved like that since she received shots at the hospital the day before.

Because Featherston suspected that something was wrong, she asked Bruno when the victim had last seen a physician. Bruno told Featherston that the victim had seen Vargas the day before, November 16, 1992. After Bruno and the victim left her office, Featherston called Vargas and made notes to herself of the visit with the victim because she was "very suspicious of what happened to her."

Pauline Barnes and her husband Benjamin Barnes lived in an apartment in Bridgeport below an apartment occupied by a Spanish man, a caucasian woman and a baby. In the early morning hours of December 14, 1992, they were asleep in their apartment when they were awakened by heavy footsteps in the apartment upstairs. Pauline Barnes recognized the footsteps as belonging to the man upstairs and remembered hearing a loud noise that "sounded like someone fell on the floor hard" or like "someone was being thrown to the floor." After approximately ten minutes, she saw the defendant and the woman leave.

At approximately 4 a.m. on December 14, 1992, Benjamin Barnes was awakened by "real heavy walking"

followed by a loud noise that shook the whole house. He then heard footsteps going downstairs and out the front door. Ten minutes later, Benjamin Barnes heard the front door open and footsteps going upstairs. Shortly thereafter, he heard "the[m] come right back to the same spot that [he] hear[d] the noise before and . . . then they turn[ed] around and [went] back outside."

At approximately 4 a.m. on December 14, 1992, Michael Fusaro, an emergency medical technician for the Bridgeport Ambulance Service, was driving an ambulance in Bridgeport with his partner, John Corris, when they were stopped by a man and a woman holding a baby, the victim. Fusaro called the dispatcher to let them know what was going on and then proceeded to assist Corris, who had initiated care to the victim. They then transported the victim to the hospital. The woman sat in the front seat of the ambulance and explained that they had decided to run to the hospital, which was only two or three blocks away, because the victim was crying and having trouble breathing.

Corris knew the condition of the victim was poor because of her limp state and because her face was blue, indicating that the victim was not breathing. After removing the victim's snowsuit, Corris noticed that the victim had no pulse. Corris also noticed that "the eyes were . . . discolored like bruises around the orbits of the eyes," which he called a "clinical sign of injury," usually indicative of head trauma. Corris put a tube into the victim's lungs, put her on a heart monitor, and gave her some medication. They also performed CPR on the victim. The victim was placed on a board for the drive to the hospital.

The victim was treated in the emergency room of Bridgeport Hospital by Deborah Spaight, a pediatric resident. Spaight noticed that the victim was not breath-

ing on her own and was not moving. Spaight also noticed that the victim had some bruising over both eyes, her cheek, the left side of her neck and on her chest. Spaight saw a cut that appeared to be healing on the left part of the victim's upper lip. In Spaight's opinion, the bruises were more than twelve hours old. A physical examination revealed that the victim had some bleeding behind the eyes, which is usually associated with a severe head injury. The victim had a CAT scan of her head which showed evidence of a skull fracture with associated bleeding inside her brain. The victim was removed from life support at 5 p.m. on December 14, 1992, and died shortly thereafter.

As a result of her examination of the victim, Spaight filed a report of suspected child abuse with the state department of social services. She did this on the basis of the severity of the head injury, the evidence of old bruises and the fact that the story from Bruno did not appear to be consistent with the victim's injuries. In Spaight's opinion, the defendant's statement also was inconsistent with the victim's injuries and the cause of the victim's death, which was cardiopulmonary arrest caused by the head injury. A post mortem X ray of the victim taken by Malka Shah revealed a healing fracture of the victim's right upper leg that would have been caused by a "tremendous amount of force." In Shah's opinion, the fracture was a minimum of two weeks old, and probably occurred after the victim's videotaped examination on November 16, 1992.[5]

The defendant testified that the victim slept on a mattress in the kitchen, that there were stuffed animals around the mattress to prevent the victim from hitting the wall, and that the victim would often roll off the

---

[5] On cross-examination, Shah admitted that it was possible that the fracture was four months old. This is consistent with the testimony of the defense experts, who opined that the fracture occurred between three and four months prior to the victim's death.

mattress during the night and lie on the floor. According to the defendant, the victim had the habit of banging her head on the floor. The defendant testified that when the victim returned from the hospital after receiving shots on November 16, she would not let anybody touch her. This behavior lasted for approximately a week and a half. He also testified that the victim's leg had been very swollen.

With regard to the victim's death in the early morning hours of December 14, 1992, the defendant testified as follows. He stayed up until approximately 2 a.m. watching television in his bedroom. Between 3:30 and 4 a.m., the defendant was awakened by the victim's crying, and he went to the kitchen and saw the victim lying on the floor. He gave her a pacifier and a toy and then went back to the bedroom. About five minutes later, the victim started crying again, and when the defendant went back to the kitchen, he saw the victim lying on her back and thought that she was choking on something. He dropped to his knees, grabbed the back of the victim's neck, squeezed her cheeks and attempted to perform mouth-to-mouth resuscitation. He then put the victim under cold water in the sink. When he realized that none of his efforts were working, he woke up Bruno, and together they tried to revive the victim. Eventually, they got dressed and started running to the hospital. En route, they flagged down an ambulance, which then took Bruno and the victim to the hospital. The defendant testified that he was not aware, when the victim went to the hospital, that she had a head injury.

I

The defendant first argues that the verdict was against the weight of the evidence. Specifically, the defendant argues that the state presented no evidence indicating that the defendant ever harmed the victim.

We conclude, however, that the evidence was sufficient for the jury to have concluded that the defendant was guilty of both the manslaughter and risk of injury counts.

"We employ a two part analysis when reviewing sufficiency of the evidence claims. First, we construe the evidence in a light most favorable to sustaining the verdict. Next, we determine whether, from the evidence and all the reasonable inferences which it engenders, a jury could rationally have concluded that the defendant was guilty beyond a reasonable doubt. . . . In this process of review, the probative force of the evidence is not diminished by the fact that the evidence may be circumstantial rather than direct." (Citation omitted.) *State* v. *Cruz*, 40 Conn. App. 515, 519, 672 A.2d 502, cert. denied, 237 Conn. 909, 675 A.2d 457 (1996). "In viewing evidence that could yield contrary inferences, the fact finder is not required to draw only those inferences consistent with innocence, but may draw whatever inferences from the evidence it deems to be reasonable and logical." *State* v. *Bruno*, 236 Conn. 514, 539, 673 A.2d 1117 (1996).

With regard to the manslaughter count, the jury was presented with conflicting evidence regarding the cause of the victim's death. The defendant presented medical testimony to support the theory that while the victim was sleeping on her mattress, she suffered a seizure, causing her to fall onto the kitchen floor and repeatedly strike her head, resulting in the skull fracture on the night in question. The state disputed this theory at trial. Kieve Berkwits, board certified in pediatrics and pediatric cardiology, testified that he examined the victim approximately two hours after she was brought to the emergency room of Bridgeport Hospital. In his opinion, even assuming that the victim had fallen off the mattress and had a seizure, that would not have caused the injuries sustained by the victim because "the severity of

the trauma to the head would be more than would be inflicted even by the child thrashing on the floor."

The state presented medical testimony to establish that the victim died as a result of a skull fracture caused by a fall from height of fifteen or twenty feet, or a "significant degree of blunt force that may be consistent with either falling from a significant height . . . striking a wall or a hard floor with significant force." The medical testimony presented by the state is consistent with the testimony of the defendant's downstairs neighbors, who were awakened by a loud noise that shook the house. The defendant testified that only he initially attended to the victim on the night in question, and that the victim's mother did not participate until he woke her up and told her that something was wrong. Finally, the jury heard the testimony of Michele Bruno, the victim's aunt, indicating a possible motive for the crime. Michele Bruno testified that after the victim returned to Connecticut from Florida in September or October of 1992, the defendant would ask her when she was coming to get the victim.[6] Construing the evidence in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have concluded that the defendant was guilty of manslaughter beyond a reasonable doubt.

With regard to the risk of injury count, the defendant was charged under General Statutes § 53-21, which provides that "[a]ny person who wilfully or unlawfully causes or permits any child under the age of sixteen

---

[6] A portion of Michele Bruno's written statement, admitted into evidence pursuant to *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), was read to the jury. It stated:

"Q. Did [the defendant] ever talk to you about the baby?

"A. Yeah. When I was on the phone with my sister I could hear him in the background. He was saying, ask her when she is coming for the baby. He would say that I could take the baby for good. He would say, come soon. He was always, well, comments like that."

years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired" shall be punished. This statute proscribes "deliberate indifference to, acquiescence in, or the creation of situations inimical to the minor's moral or physical welfare . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *George*, 37 Conn. App. 388, 391, 656 A.2d 232 (1995). The jury in the present case heard testimony indicating that the victim lived in the same apartment as the defendant during the period of time that she sustained various injuries to her body, including a fractured leg.[7] The evidence was sufficient for the jury to conclude that the defendant permitted and acquiesced in the living arrangements, which created a situation in which the victim's health was likely to be impaired. We conclude, therefore, that the evidence was sufficient for the jury to have concluded that the defendant was guilty of risk of injury to a child beyond a reasonable doubt.[8]

## II

The defendant next argues that the trial court abused its discretion in allowing joinder of the risk of injury and manslaughter counts. He argues that such joinder resulted in substantial prejudice and violated his right to a fair trial. We agree.

The information in this case charged that the defendant, on December 14, 1992, committed manslaughter in

---

[7] As stated above, the parties dispute when the victim actually sustained the fractured leg.

[8] The parties have not raised the question of whether a defendant must have any relationship or legal duty to a victim in order to be charged with risk of injury to a child by wilfully or unlawfully causing or permitting the victim to be placed "in such a situation that its life or limb is endangered, or its health is likely to be injured or its morals likely to be impaired." The statute itself contains no stated requirement or element that there be any legal relationship or duty between the victim and the defendant. The defendant makes no claim that the evidence is insufficient due to a failure of the state to prove a particular relationship or legal duty to the victim. We therefore do not address this issue.

the first degree. The information further charged that the defendant committed risk of injury to a child by wilfully and unlawfully causing and permitting the victim to be placed in a situation in which her health was likely to be impaired. The date specified for the risk of injury count was "approximately November 1, 1992, to December 14, 1992." Prior to the commencement of jury selection, the trial court heard argument on the defendant's motion to sever the manslaughter and risk of injury counts.[9] The trial court denied the motion. According to the defendant, the evidence presented by the state on the manslaughter count was bolstered and shored up by the risk of injury count, thereby resulting in substantial prejudice to the defendant.

"In a joint trial . . . an omnipresent risk is that 'although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all.' *United States* v. *Lotsch*, 102 F.2d 35, 36 (2d Cir.), cert. denied, 307 U.S. 622, 59 S. Ct. 793, 83 L. Ed. 1500 (1939)." *State* v. *Boscarino*, 204 Conn. 714, 721–22, 529 A.2d 1260 (1987). Our Supreme Court has stated "that severance may be necessary to prevent undue prejudice resulting from consolidation of two or more charges for trial when: (1) the cases do not involve discrete, easily distinguishable factual scenarios; (2) one or more of the counts alleges brutal or shocking conduct by the accused; or (3) the trial is one of long duration or very complex. *State* v. *Boscarino*, supra, 722–24 . . . . Whether to grant a severance, however, is a decision committed to the sound discretion of the trial court, the exercise of which will not be disturbed

---

[9] General Statutes § 54-57 provides: "Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise." See also Practice Book § 829.

on appeal absent manifest abuse. . . . Finally, '[i]t is the defendant's burden on appeal to show that the denial of severance resulted in substantial injustice, and that any resulting prejudice was beyond the curative power of the court's instructions.' . . . *State* v. *Boscarino*, supra, 721." (Citations omitted.) *State* v. *Chance*, 236 Conn. 31, 42, 671 A.2d 323 (1996).

"Substantial prejudice does not necessarily result from a denial of severance even where evidence of one offense would not have been admissible at a separate trial involving the second offense. A trial court will not have manifestly abused its discretion in denying severance if the state's orderly presentation of evidence has prevented confusion of the jury and has enabled the jury to consider the evidence relevant to each charge separately and distinctly." (Internal quotation marks omitted.) *State* v. *Jones*, 37 Conn. App. 437, 446, 656 A.2d 696, cert. denied, 233 Conn. 915, 659 A.2d 186 (1995).

In the present case, we initially conclude that the two counts do not involve discrete, easily distinguishable factual scenarios. In addition, the evidence relating to the risk of injury count and the manslaughter count was presented at the same time and culminated with the evidence of the death of the victim on December 14, 1992.[10] Although the risk of injury count charged

---

[10] As the state argued in opposition to the motion to sever, "we have the same victim involved in all three counts. We have the same location involved in all three counts. We have the same victim but also roughly the same time period involved in all three counts. While the first two counts specifically focus on December 14 of 1992, which is the date that the victim in this particular case, the state believes, suffered the head injury—the fractured skull which thereby led to her death, the risk of injury covers the time before that—November 1 to December 14. So we basically have the same time period involved. As part of that, the state intends to produce evidence of the child's condition when seen by medical personnel in November, 1992, which goes to the risk of injury charge.

\* \* \*

"I would also note the state believes the witnesses will be the same for both in this case—the two charges. It just doesn't make any sense *when*

that the defendant acquiesced in the physical abuse of the victim not inflicted by the defendant, and the manslaughter count charged that the defendant caused the victim's death, both counts involve allegations of physical abuse inflicted on the victim over a continuous period of time.[11]

We further agree with the defendant that the evidence presented against him on the manslaughter count consisted primarily of the noises heard by the defendant's downstairs neighbors, and the testimony of Bruno's sister that the defendant wanted her to "come and get the baby." There was also conflicting evidence from medical experts as to what caused the victim's injuries. Considering the nature of this evidence, and the evidence admitted on the risk of injury count that the victim had suffered physical abuse in the autumn of

the evidence is basically the same and the risk of injury charge necessarily involves what happened on the night of December 14 including his conduct on that particular evening." (Emphasis added.)

[11] In addition to relying on State v. Chance, supra, 236 Conn. 31, the dissent also relies on several other cases as examples of where the court has allowed joinder of both risk of injury and manslaughter or murder counts. We note initially that none of these cases raises on appeal the issue of whether the different counts were properly joined at trial. We further note that the factual scenarios of those cases are easily distinguishable from the present case, because in each of these cases, with regard to the risk of injury count, the defendant committed some act of violence, whether on the victim or a third party, whereas in the present case, the defendant was charged with having acquiesced in the physical abuse of the victim not inflicted by the defendant. See State v. DeJesus, 236 Conn. 189, 672 A.2d 488 (1996) (defendant killed his estranged girlfriend with machete while her two children were playing nearby); State v. Chicano, 216 Conn. 699, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991) (defendant killed minor victim by strangulation and killed his mother and her boyfriend with a crowbar); State v. Alford, 37 Conn. App. 180, 655 A.2d 782, cert. denied, 234 Conn. 914, 660 A.2d 357 (1995) (defendant struck and beat two year old victim on numerous occasions); State v. Migliaro, 28 Conn. App. 388, 611 A.2d 422 (1992) (state presented evidence that minor victim died as the result of head injury caused by abuse, or shaken baby syndrome, inflicted by defendant, who was convicted of criminally negligent homicide and risk of injury to a child).

1992, the defendant was exposed to the potential prejudice that the jury would decide, cumulatively, that the defendant was predisposed to commit violence upon the victim.

With regard to the second *Boscarino* factor, we conclude that the manslaughter count alleged "brutal or shocking conduct by the accused." As stated previously, the state alleged on the manslaughter count that the victim suffered her fatal injuries by a severe degree of blunt force, consistent with either falling from a significant height or striking a wall or hard floor with significant force. Such abuse perpetrated on a sixteen month old child afflicted with Down's Syndrome certainly falls within the category of "brutal or shocking conduct by the accused."

"Having established the scope and extent of the prejudice to which the defendant was exposed, we must next determine whether the jury instruction at the conclusion of trial was adequate to mitigate that prejudice." *State* v. *Horne*, 215 Conn. 538, 551, 577 A.2d 694 (1990). In *State* v. *Horne*, 19 Conn. App. 111, 562 A.2d 43 (1989), rev'd, 215 Conn. 538, 577 A.2d 694 (1990), we recognized the potential prejudice involved in the consolidation of four cases for trial, yet we affirmed the trial court's consolidation of the cases on the ground that the trial court's jury instruction cured the potential prejudice. We stated in that case that "[t]he court's instructions were particularly thorough and extensive. The court referred to the 'four separate and distinct alleged incidents or transactions,' and repeatedly instructed the jury that it must consider each incident separately from the others, stressing that to do so was of the 'utmost importance,' and 'most important.' The court further cautioned the jury that it 'must not mix the evidence of one incident with the evidence of another,' and that its judgment on one must not affect its judgment on another. The court emphasized that the cases were con-

solidated by the court for 'judicial efficiency and nothing more,' and that the jury must not draw any inference from the consolidation. Further, the court directly addressed the 'natural tendency to conclude that a person must be guilty of one or more of the consolidated matters because there are so many,' and warned that '[i]f you think this way you have merged the offenses and have [fallen] prey to exactly what you must not do.' The court instructed the jury that the state's case 'is only as good as the evidence which underlies each specific and singular incident,' and that to judge the cases 'without analyzing each incident separately is not in accord with our system of government.'

"Later in its charge, the court reminded the jury that although the same law of robbery applied to each of the incidents, 'you must apply it separately in each of the four incidents and not . . . run them together because we have tried them together.' Finally, at the end of its instructions the court reminded the jury 'to treat [each] incident separately,' and to put the state to its burden of proof separately on each incident." Id., 121–23. After granting certification, our Supreme Court held, however, that the charge did not mitigate the prejudice and reversed our decision. *State* v. *Horne*, supra, 215 Conn. 545–46.

The jury charge in the present case falls far short of the charge that was deemed inadequate in *Horne*. Prior to commencing voir dire, the trial court stated that "[e]ach count is a separate crime and must be proved by the state individually beyond a reasonable doubt" and "there are three separate charges against this defendant in this information." At the commencement of its final charge, the trial court briefly instructed that "[e]ach count is a separate crime and you must consider them separately in your deliberations." The only other reference in the final charge to the separate counts was when the court later reiterated that "each and every

count is a charge of a separate crime and must be proved individually and separately beyond a reasonable doubt." Finally, the trial court instructed that the jury's verdict "must be unanimous on each count." We conclude that the trial court's brief charge to keep the counts separate from one another was not sufficient to overcome the prejudice caused by the joinder of the risk of injury and manslaughter counts. "The government should not have the windfall of having the jury be influenced by evidence against a defendant which, as a matter of law, they should not consider but which they cannot put out of their minds. . . ." (Citations omitted; internal quotation marks omitted.) Id., 553. This is especially true in the present case where the essence of the risk of injury charge related to acts committed by another in which the defendant allegedly acquiesced, not in acts committed by the defendant himself.[12]

---

[12] Our conclusion is further supported by *State* v. *Chance*, supra, 236 Conn. 31. Unlike the trial court in the present case, the trial court in *Chance* ordered a bifurcation of the evidentiary portion of the trial after granting the state's motion to consolidate arson and assault counts against the defendant. The trial court required the state and the defendant first to present all of their evidence on the arson charge, followed by the evidence on the assault charge.

The Supreme Court, affirming the trial court's decision, noted that the two charges arose from two discrete incidents, the conduct involved was not "brutal and shocking," the issues were simple and straightforward, the evidence was uncomplicated, and the trial lasted only five days. The Supreme Court further noted that the trial court, unlike the trial court in the present case, correctly instructed the jury as follows: " 'As I have already made clear throughout this proceeding, the defendant is charged with two separate offenses, even though those cases were consolidated into a single trial. In one information, the state has charged Mr. Chance with arson in the first degree and in the other information the state has charged the defendant with assault on a department of correction employee. You must consider each alleged incident separately and distinctly from the other. You must keep them both separate in your evaluation of the facts and separate in your minds in the determination of your verdict. The evidence from one alleged incident must not be considered by you or affect your verdict in the other alleged incident. Also, by virtue of the fact that there are two separate informations pending against the defendant, you must not hold that against the defendant in any way. The court has consolidated these

The judgment is reversed and the case is remanded for a new trial.

In this opinion LAVERY, J., concurred.

DUPONT, C. J., dissenting. I disagree with the majority's conclusion that the trial court abused its discretion in allowing the risk of injury and manslaughter counts to be tried together and that such joinder resulted in substantial prejudice and violated the defendant's right to a fair trial. I conclude, for a number of reasons, that the trial court did not abuse its discretion in denying the defendant's motion to sever.

The leading case of *State* v. *Chance*, 236 Conn. 31, 671 A.2d 323 (1996), reiterates the teachings of *State* v. *Boscarino*, 204 Conn. 714, 529 A.2d 1260 (1987). The factors discussed in *Boscarino* to determine whether severance of charges should be had are whether the charges involve distinguishable, discrete events, whether at least one of the counts involves brutal or shocking conduct whereas other counts do not, and whether the trial is of long duration or complex. Id., 722–23. In this case, the information for the manslaughter charge alleged that the crime occurred on December 14, 1992, whereas the dates of the risk of injury charge were November 1 to December 14, 1992. The man-

two alleged incidents for the purpose of judicial expediency. The court is attempting to see to it that the introduction of evidence was conducted in an orderly fashion first with respect to the first incident and then with respect to the second. The purpose of this order was to assist you in keeping these two alleged incidents separate and distinct. You cannot merge the two incidents in any way. For that reason you should deliberate on each charge separately. Remember, the state must prove each element of the offense beyond a reasonable doubt before you return a guilty verdict on a charge. The fact that there are two separate charges here does not mean that the state has a lesser standard or burden of proof with respect to either charge.'" Id., 41–42 n.14.

The trial court in *Chance* later restated, "'Again I will remind you that you are dealing with two separate cases here. You are to consider them separate and apart from one another . . . .'" Id.

slaughter and risk of injury were discrete crimes, with different dates and injuries. Both crimes are shocking and evidence as to one was not likely to inflame the jury to find guilt of the other. Furthermore, the trial was not complex or lengthy.

It can never be certain before an actual attempt to introduce evidence is made and, in the event of an objection, the ruling thereon, whether particular evidence will be admissible. Here, however, it is likely that some of the injuries relating to the risk of injury charge, would likely be admissible in the manslaughter case, had that charge been tried separately. Proof of prior crimes or proof of conduct is admissible if it is relevant to some other issue material to the case, such as intent, opportunity, state of mind, common scheme or is relevant to the absence of mistake or accident. C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 8.3.2. Such evidence is admissible whether the crimes or conduct resulted in an arrest or a conviction. Id. Thus, the defendant's right to have a jury independently consider the evidence of each crime was not significantly impaired due to the fact that the cases were tried together.

There is a clear presumption in favor of the consolidation of charges and against severance. *State* v. *Chance*, supra, 236 Conn. 38. Many cases involve joinder of charges of both risk of injury and manslaughter or murder. See *State* v. *DeJesus*, 236 Conn. 189, 672 A.2d 488 (1996); *State* v. *Chicano*, 216 Conn. 699, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991); *State* v. *Alford*, 37 Conn. App. 180, 655 A.2d 782, cert. denied, 234 Conn. 914, 660 A.2d 357 (1995); *State* v. *Migliaro*, 28 Conn. App. 388, 611 A.2d 422 (1992).

In *State* v. *Chicano*, supra, 216 Conn. 699, the defendant was convicted of three counts of felony murder,

three counts of manslaughter in the first degree, one count of risk of injury to a child and one count of burglary in the second degree; in *State* v. *DeJesus*, supra, 236 Conn. 189, the defendant was charged with one count of murder, two counts of risk of injury to a child and one count of carrying a dangerous weapon. Although these cases were tried to three judge panels, it would be hard to imagine more shocking or complicated criminal cases.

In *State* v. *Migliaro*, supra, 28 Conn. App. 388, the defendant was tried before a jury on the charges of manslaughter and risk of injury to a child. The defendant claimed that he found the victim, the defendant's twelve week old daughter, lying on the floor at the bottom of a set of stairs and that she was not breathing. Id., 389–90. The defendant claimed that he had no idea how the victim had gotten there. Id., 390. The victim was transported by ambulance to a hospital where she died shortly thereafter. The state produced expert medical testimony that the victim died as a result of shaken baby syndrome. Id., 391. The jury found the defendant guilty of the lesser included offense of criminally negligent homicide and of risk of injury to a child. Id., 389.

In *State* v. *Alford*, supra, 37 Conn. App. 180, the defendant was also tried before a jury and charged with counts of manslaughter in the first degree, assault in the first degree and risk of injury to a child. The injuries involved in the risk of injury charges were at least as appalling than those involved in the risk of injury charges in the present case and were even more entwined with the manslaughter charge.

On the basis of on the guidelines established in our appellate cases, I do not believe that the charges in the present case had to be severed for trial and I would not grant a new trial on that basis.

Accordingly, I respectfully dissent.