[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON POST-JUDGMENT MOTIONS
On October 2, 2002, the jury in the above-captioned matter entered a verdict in favor of the defendant. Presently before the court are the following post-verdict motions:
 • Plaintiff's Motion to Set Aside and/or Arrest of Judgment (#143)
 • Defendant's motion for order that the plaintiff disclose information concerning the basis for its Good Faith Certificate (#144), and
 • Defendant's motion to accept its bill of costs (#s 145 and 146.)
For the following reasons, the plaintiffs motion to set aside is denied and defendant's motion to accept its bill of costs is granted in part and denied in part. The defendant's motion for order is granted.
 I — PLAINTIFF'S MOTION TO SET ASIDE AND/OR ARREST VERDICT
On October 7, 2002, the plaintiff filed her motion to set aside the verdict pursuant to Practice Book § 16-35. She asserts two bases for setting aside the jury's verdict, that the verdict is "against the weight of evidence" and that "discovery of a note on the chair of plaintiffs counsel after closing arguments and before the court's charge indicates impropriety in the courtroom and raises the issue that the verdict should be impeached." (Plaintiffs motion, pages one and two.) The defendant filed a written objection to the motion to set aside on October 23, and the parties appeared on all post-judgment motions on November 1, 2002. The court will address each claim in turn.
A. Sufficiency of the evidence
CT Page 252
The plaintiff motion states the following as its basis for claiming that the verdict is contrary to the weight of evidence:
 the defendant admitted: (a) that he advised the plaintiff the experience of the facial laser surgery would be "like a bad sunburn;" (b) that a sunburn is a first degree burn; and (c) that the laser induced second degree burns. The court should find, as a matter of law, that the doctor's advice was therefore a misstatement and a misrepresentation of material fact that deprived the plaintiff of meaningful informed consent to the procedure.
(Id. at one.)
1. Standard of Review
In deciding a sufficiency of evidence claim on a motion to set aside a verdict, this court follows oft-stated principles:
 The trial court should not set a verdict aside where there was some evidence upon which the jury could reasonably have based its verdict, but should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles . . . Ultimately, the decision to set aside a verdict entails the exercise of a broad legal discretion . . . Limiting that discretion, however, is the litigants' constitutional right to have issues of fact determined by a jury where there is room for a reasonable difference of opinion among fair-minded jurors. . . .
(Citations omitted; internal alterations and quotation marks omitted.)Labbe v. Pension Commission, 239 Conn. 168, 191-93, 682 A.2d 490 (1996).Purzycki v. Fairfield, 244 Conn. 101, 106, 107, 708 A.2d 937 (1998). "The jury's verdict must stand if they could reasonably and legally have reached their conclusion." Chieffalo v. Norden Systems, Inc.,49 Conn. App. 474, 480, 714 A.2d 1261 (1998). "In making the determination as to whether to set aside a verdict, the evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable." (Quotations omitted; alterations omitted.) Gaudio v. Grifin Health Services Corp.,249 Conn. 523, 534, 733 A.2d 197 (1999). CT Page 253
2. The evidence in this case
Although the complaint alleged both breach of the standard of care and lack of informed consent, the plaintiff tried this case only on the latter claim, that the defendant had not obtained her informed consent for the laser facial resurfacing procedure that he performed on her on October 14, 1998. The heart of the plaintiffs case on liability, and on which her claim foundered before the jury,[1] was her allegation the defendant did not provide her with adequate and sufficient information adequately describing the nature of the procedure and its effects and the known material risks and hazards of the procedure beforehand. The relevant legal standard for this issue, as articulated by our Supreme Court, is that a physician must disclose all material information about the nature of the procedure and its known material risks that a reasonably prudent person in the patient's position would have found significant in deciding whether to submit to the proposed procedure.[2]Logan v. Greenwich Hospital Assoc., 191 Conn. 282, 292, 465 A.2d 294
(1983); Godwin v. Danbury Eye Physicians Surgeons, 254 Conn. 131,143, 757 A.2d 516 (2000).
The plaintiffs motion to set aside seems to rest upon a flawed syllogism. She first asserts three premises that the jury might reasonably have found proven here:
 • That the defendant advised the plaintiff that facial laser surgery would be "like a bad sunburn;"
 • That, as the defendant testified, a sunburn is an example of a first degree burn; and yet
 • That, as the defendant testified, the laser induced second degree burns.
From those premises, however, she argues a conclusion that does not logically follow: that the advice of Dr. Singer — that the procedure would produce effects like those of a bad sunburn — was, in effect, telling Ms. Singer that she would experience only a first degree burn, whereas the procedure actually causes a second degree burn. The plaintiff claims that the defendant's description of facial laser resurfacing as causing a "bad sunburn" was thus a misrepresentation of material fact. Yet the evidence cited by the plaintiff in her motion to set aside did not stand alone. Dr. Singer also told the jury that skin redness caused by an hour in the sun — what he characterized as "very mild sunburn" with "a little bit" of related pain — is an CT Page 254 example of a first degree sunburn. In contrast, Dr. Singer testified that a bad sunburn is a second degree burn. The plaintiff herself testified that the defendant told her that the effects of the facial laser resurfacing procedure would be like those of"a very bad sunburn." Dr. Singer also testified that the plaintiff told him she had once experienced a bad sunburn that had caused blisters and heatstroke, and he had thus used her past experience as a way of describing, in lay terms that his patient could understand, what she would experience.
The parties' testimony differed significantly as to how Dr. Singer characterized a very bad sunburn. Ms. Schwartz testified that after her earlier sunburn, her skin had flaked a few days later but that she had experienced no blistering, cracking or peeling skin and that the next day, when she went out into the sun, it had "stung a little." She claimed that Dr. Singer had advised that her skin would be red or pink for a while after the procedure, but that he did not tell her that her skin would blister. In contrast to the plaintiffs testimony, the defendant testified that he told the plaintiff that after the procedure she would be in pain, she would "look terrible" for a while, and her skin would swell, then ooze, then get crusty and start weeping. (The plaintiff herself conceded at trial that Dr. Singer told her she would probably need pain medicine after the procedure.) He testified that he described all of the possible risks and consequences of the procedure using terms that his patient could understand.
The testimony of Ms. Schwartz and Dr. Singer thus stood in stark conflict. In that respect, that plaintiffs testimony had serious credibility problems. Although she denied at trial any lack of memory about the events in question, her therapist testified that she had repeatedly told him that she had difficulty remembering the procedure and the events surrounding it. His contemporaneous notes of therapy sessions with Ms. Schwartz, introduced into evidence as a defense exhibit, memorialized her comments to that effect:
 • "Very fearful of giving wrong information and facts — Has great trouble with memory and with recollection" (September 5, 2001);
 • "Knows memory impaired. Can't remember day of surgery and events surrounding it." (September 26, 2001); A
 — "Still upset with gaps in her memory — Tough to recall events surrounding trauma — Feels confused too at times in recall" (October 5, 2001). CT Page 255
(Def.'s ex. 6.) Other parts of the plaintiffs testimony also called into question her credibility. Although claiming on direct examination that she resigned from employment in real estate because of the after-effects of the laser procedure, she admitted on cross-examination that she gave different reasons to her employer for resigning. She admitted not disclosing all her 1998 income on her federal tax return for that year and listing her house-cleaning business, which she testified was a partnership with another individual, as a sole proprietorship on her 1999 tax return.
Although the plaintiff offered explanations at trial for some of this impeachment evidence, the resolution of this case turned on the jury's assessment of the credibility of the witnesses. Did Dr. Singer fail to disclose the risk and benefits of the surgery, as Ms. Schwartz maintained, or did he inform her of those risks, as he maintained? Resolving such conflicts in testimony is the classic function of the trier of fact, whose decision the court should not overturn but to avoid "manifest injustice" or for lack of any evidence upon which the jury could reasonably have based its verdict. Giving the evidence the most favorable construction in support of the verdict reached, this court cannot say that setting that verdict aside is necessary based on the standards set down by our appellate courts.
B. Jury Misconduct
The plaintiff also seeks to set aside the verdict on the grounds of juror misconduct. In this case, shortly before the court's charge, her attorney told the court that he had found on his chair at counsel table a piece of paper with writing. The paper, which the court had marked as a court's exhibit, did not refer directly to the trial or any of its participants but contained the following three lines in the handwriting of an unidentified person:
 Are there any competency problems we should know about? No Just Very Slow
When informed of the possibility of juror misconduct or juror exposure to extrinsic evidence, the court's duty is to conduct an inquiry appropriate to the circumstances.
 Where it appears during the course of a trial that the jury panel may have been exposed to prejudicial extrinsic evidence, the trial court must conduct an investigation to determine whether jury misconduct occurred. There is no magic formula that the trial CT Page 256 court must follow in conducting this inquiry. Rather, it must use whatever inquisitorial tools are necessary and appropriate to determine whether there was a reasonable possibility of prejudice.
(Citations omitted; quotation marks omitted) State v. Migliaro,28 Conn. App. 388, 396, 611 A.2d 422 (1992). In the present case, the court concluded that an appropriate investigation to determine whether there had been juror misconduct, or if the jury had been exposed to prejudicial extrinsic evidence, would be to question each juror and alternate separately. The court so informed counsel and parties of this plan, to which neither party objected. The court then conducted individual examinations of each juror and alternate, based on which the court found that none were aware of or had read the note. In the presence of counsel and both parties, the court asked each one whether he or she knew about the note, had seen it, or had read it. All said they had no knowledge of the note, and had never seen or read it. No evidence was offered as to who had authored the note. Following the inquiry, neither counsel asked for further court action. The court thus concluded that there was no probative evidence either of juror misconduct or that any juror been exposed to prejudicial extrinsic information.
The plaintiff has presented no new information to cause this court to reconsider its previous findings or that there were any proprieties in the courtroom prejudicing the rights of either party or requiring the verdict to be set aside. Moreover, the plaintiffs failure to object to the procedure utilized by the court or to request additional inquiry bespeaks her belief then that the court's inquiry was appropriate, and her failure thereafter to request a mistrial her belief that the writing her attorney said he found did not cause her undue prejudice or reflect juror misconduct.
 II — DEFENDANT'S MOTION TO ACCEPT BILL OF COSTS
The defendant's motion to accept its bill of costs raises the novel question of whether a prevailing party called as an expert witness by the other side may tax costs for that expert testimony. In this case plaintiff initially disclosed another expert witness, whose testimony was precluded by the court after plaintiff did not make that witness available for a pretrial deposition. Plaintiff then filed a disclosure naming the defendant, previously disclosed by his own counsel as an defense expert witness, as an expert witness to be called by plaintiff. The defendant objected to being called as an expert by his adversary. After initially sustaining that objection on the grounds of untimely disclosure, the court reconsidered that ruling, and, pursuant to Lane v. Stewart, CT Page 25746 Conn. App. 172, 177, 698 A.2d 929 (1997) ("[W]here one party has disclosed an expert witness . . . and that expert witness has either been subsequently deposed by the opposing party, or the expert's report has been disclosed pursuant to discovery, then either party may call that expert witness to testify at trial."), allowed plaintiff to call Dr. Singer as an expert witness as to areas covered in the deposition of Dr. Singer.
Section 7-2 of the Connecticut Code of Evidence, "Testimony by Experts," provides that
 A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue.
Upon calling Dr. Singer as a witness, the plaintiff asked numerous questions about his professional training and experience of the sort customarily used to qualify a witness as an expert and establish his credentials before the jury. Although most of his Dr. Singer's testimony was fact testimony, portions were clearly expert testimony "based on [his] special skills or knowledge as [a] medical [doctor], and were matters outside the ordinary knowledge of the jurors." Wright v. Hutt,50 Conn. App. 439, 452, 718 A.2d 968 (1998). For example, Dr. Singer answered inquiry of plaintiffs counsel as to whether "feathering," a procedure by which a plastic surgeon blends treated and untreated skin so as to eliminate sharp contrasts of skin tint, was part of the standard of care for the facial laser resurfacing procedure he performed. In response to other questions by plaintiffs counsel, Dr. Singer testified about alternatives to and the risks and effects of that procedure, and differences between various degrees of burns.
The court is not aware of any case law, at the trial court or appellate level, addressing this unusual situation. Subsection (f) of section 52-260
of the general statutes, as amended by Public Act 01-32, provides as follows:
 When any practitioner of the healing arts, as defined in section 20-1 . . . gives expert testimony in any action or proceeding, including by means of a deposition, the court shall determine a reasonable fee to be paid to the practitioner of the healing arts . CT Page 258 . . and taxed as part of the costs in lieu of all other witness fees payable to the practitioner of the healing arts . . .[3]
As a medical doctor, the defendant obviously qualifies as a "practitioner of the healing arts." He did provide expert testimony at trial. The statute would appear, based on its literal terms, to allow the court to "determine a reasonable fee" to be paid to him and "taxed as a part of costs." Yet as our appellate courts' mantra of statutory construction so clearly instructs, interpreting a statute requires looking beyond statutory language:
 [T]he process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter.
(Citations omitted; internal quotation marks omitted.) Wright Bros.Builders, Inc. v. Dowling, 247 Conn. 218, 226-27, 720 A.2d 235 (1998).
At the early common law, neither party could recover costs of suit from the other. Each party bore the full cost of pursuing its claims and defenses[4] until 1278 when, during the reign of Edward I, parliament enacted the Statute of Gloucester (6 Edw. 1), which, among other provisions, allowed successful plaintiffs to recover moderate counsel fees and certain expenses. Costs for prevailing defendants were allowed later. Courts in the United States have followed the English system except for the award of counsel fees, which state and federal legislatures refused to allow. Day v. Woodworth, 54 U.S. 363, 372, 13 How. 363, (1851). The historic purpose for awarding costs has been to defray in part the expense incurred by a prevailing party in successfully asserting its rights; II E. Stephenson, Connecticut Civil Procedure (3d Ed. 1997) § 178, p. 344-345; though, since the nation's earliest days, "legal taxed costs [have been] far below the real expenses incurred by the litigant." Day v. Woodworth, supra, 54 U.S. 372.
An award of costs for expert testimony by a physician in a civil case is a relatively recent addition to the array of taxable items in Connecticut, first authorized by the General Assembly in 1967 in Public Act 67-263. The legislative history of that bill shows that it was CT Page 259 enacted to facilitate the obtaining of physician testimony by imposing judicial control over the amount of fee necessary to pay such a witness for expert testimony.[5] The ordinary course of taxing costs for expert witness testimony involves awarding the prevailing party the reasonable fees it incurred in calling its expert witnesses. Yet nothing in that legislative history, or cases under the statute since then, suggests any basis for denying an expert witness fee to a party called by an opponent to the witness stand as an expert. The court is left, in interpreting the statute, to its plain language and the purposes of the statute. The time taken by the expert portions of Dr. Singer's testimony is time he could have spent with patients or otherwise engaged in his professional practice. The value of that lost time is an expense imposed on the defendant for asserting his right to defend against the plaintiffs claims. The court thus concludes that the defense may tax costs for Dr. Singer's expert testimony.
The court agrees, however, with the plaintiffs position that the expert witness fee to be taxed must related to the time spent by the defendant testifying as an expert. The court does not believe that the full amount sought by defendant is reasonable, since he would have been in court anyway and most of his testimony was not expert but factual testimony. Thus the court will allow defendant a reasonable expert witness fee of $500 for Dr. Singer's expert testimony. As set forth in the margin, any expert witness fee for Dr. Seckel are disallowed. The clerk may tax all other costs sought by the defendant pursuant to statute.
BY THE COURT
 ___________________ STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT