# STATE OF CONNECTICUT *v.* RAFAEL DELGADO
## (SC 15524)

Borden, Berdon, Norcott, Palmer and McDonald, Js.

Argued September 26, 1997—officially released January 27, 1998

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Stephen J. Sedensky III,* assistant state's attorney, for the appellant (state).

*Francis J. DiScala,* with whom were *Francis J. DiScala, Jr.,* and *John P. Thygerson,* for the appellee (defendant).

*Opinion*

PALMER, J. The defendant, Rafael Delgado, was convicted after a jury trial of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1),[1] and risk of injury to a child in violation of General Statutes (Rev. to 1991) § 53-21.[2] The trial court rendered judgment sentencing the defendant to a total effective sentence of thirty years imprisonment, suspended after twenty-two years, and five years probation.[3] The defendant appealed to the Appellate Court, and a divided panel of that court reversed the trial court's judgment on the ground that the trial court improperly had denied

[1] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . ."

The defendant also had been charged with manslaughter in the first degree in violation of § 53a-55 (a) (3), but was acquitted of that charge by the jury.

[2] General Statutes (Rev. to 1991) § 53-21 provides: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

[3] The defendant received a sentence of twenty years imprisonment, suspended after seventeen years, and five years probation, on the manslaughter count, and a prison term of ten years, suspended after five years, and five years probation, on the risk of injury count, the sentences to run consecutive to one another.

the defendant's motion to sever the trial of the manslaughter and the risk of injury counts.[4] *State* v. *Delgado*, 42 Conn. App. 382, 681 A.2d 327 (1996). We granted the state's petition for certification limited to the issue of whether the Appellate Court properly determined that the trial court had abused its discretion in the joinder of the two counts. *State* v. *Delgado*, 239 Conn. 920, 682 A.2d 1008 (1996). We conclude that the trial court did not abuse its discretion in denying the defendant's severance motion and, consequently, we reverse the judgment of the Appellate Court.[5]

The opinion of the Appellate Court sets forth the following facts that the jury reasonably could have found. "The victim was a sixteen month old baby with Down's Syndrome who, at the time of her death on December 14, 1992, resided with her mother, Devilyn Bruno, and her mother's boyfriend, the defendant, Rafael Delgado, in an apartment in Bridgeport. In the spring of 1992, the victim was taken by her aunt to live with her grandmother in Florida. The victim was returned to Connecticut in September or October of 1992. After the victim's return to Connecticut, the defendant inquired of the aunt when she was taking the victim back to Florida.

[4] Chief Judge Dupont dissented from the decision of the majority, concluding that the trial court had not abused its discretion in denying the defendant's severance motion. *State* v. *Delgado*, 42 Conn. App. 382, 399–401, 681 A.2d 327 (1996).

[5] On appeal from the judgment of the trial court to the Appellate Court, the defendant also claimed that: (1) the evidence was insufficient to support the jury's verdict; (2) the trial court improperly excluded the testimony of a defense expert witness due to an alleged violation of a sequestration order; (3) the trial court improperly admitted evidence of prior injuries to the victim; (4) the trial court improperly allowed into evidence a videotape of the victim and her mother; and (5) the trial court's charge to the jury was misleading and confusing, resulting in the dilution of the state's burden of proof. Although the Appellate Court considered and rejected the defendant's claim of evidentiary insufficiency; see *State* v. *Delgado*, supra, 42 Conn. App. 389–92; it did not address the defendant's remaining claims. The Appellate Court, therefore, will be required to consider those claims on remand.

"On November 16, 1992, the victim was seen at the St. Joseph's Family Medical Center in Stamford for her fifteen month checkup. The nurse on duty noticed that the victim had three bruises on her face, one on each temple area and one on the right cheek. When the nurse questioned Bruno about the bruises, Bruno responded that the victim had sustained the bruises when she fell out of a bouncing chair approximately three or four days earlier.

"On the same day, Tammy Vargas, a family practice physician at St. Joseph's Family Medical Center, examined the victim. Vargas had previously examined the victim in April, 1992, at which time she did not notice any bruises on the victim or problems with the victim's arms or legs. During the examination on November 16, 1992, which was videotaped,[6] Vargas noticed some bruises on the victim's forehead and ordered blood work to rule out any bleeding abnormality. Bruno told Vargas that all of the victim's bruises were caused when the victim fell off of a bouncing chair. Bruno also told Vargas that the victim sometimes put her fingers in her nose causing nosebleeds. Vargas found no indication that the victim tended to bang her head or had a sleep disorder, and no indication that the victim had a broken right leg. Vargas had a 'slight suspicion' of child abuse.

"On December 8, 1992, Bruno had a conversation with Vargas in which she indicated that the victim had a swelling in her thigh. Bruno told Vargas that she thought the swelling was on the same side where the victim had received a shot. Vargas could not recall on what part of the body the shots were given, but, according to the medical records, the victim did receive shots on November 16, 1992. Since Vargas did not see the victim after November 16, 1992, she did not know the cause of the swelling.

---

[6] "The videotape was played for the jury." *State* v. *Delgado*, supra, 42 Conn. App. 385 n.4.

"Regina Featherston, a nutritionist for Women, Infants and Children (WIC), a federally funded nutrition program for children and pregnant women, first saw the victim on February 26, 1992. On that date, Featherston did not notice any bruises on the victim and the victim allowed Featherston to pick her up and to hold her. Featherston next saw the victim on November 17, 1992. At that time, Featherston noticed bruises around the victim's forehead and on her cheeks. She also noticed a pattern of tiny cuts around the victim's eyes and black and blue marks on both sides of the victim's chin. Featherston asked Bruno about the victim's injuries and Bruno told her that the victim had fallen out of a rocking chair. When Featherston attempted to pick the victim up, the victim screamed and tried to get away from her. The victim had the same reaction when Bruno went to pick her up. Bruno explained to Featherston that the victim had behaved like that since she received shots at the hospital the day before.

"Because Featherston suspected that something was wrong, she asked Bruno when the victim had last seen a physician. Bruno told Featherston that the victim had seen Vargas the day before, November 16, 1992. After Bruno and the victim left her office, Featherston called Vargas and made notes to herself of the visit with the victim because she was 'very suspicious of what happened to [the victim].'

"Pauline Barnes and her husband, Benjamin Barnes, lived in an apartment in Bridgeport below an apartment occupied by a Spanish man, a Caucasian woman and a baby. In the early morning hours of December 14, 1992, they were asleep in their apartment when they were awakened by heavy footsteps in the apartment upstairs. Pauline Barnes recognized the footsteps as belonging to the man upstairs and remembered hearing a loud noise that 'sounded like someone fell on the floor hard' or like 'someone was being thrown to the

floor.' After approximately ten minutes, she saw the defendant and the woman leave.

"At approximately 4 a.m. on December 14, 1992, Benjamin Barnes was awakened by 'real heavy walking' followed by a loud noise that shook the whole house. He then heard footsteps going downstairs and out the front door. Ten minutes later, Benjamin Barnes heard the front door open and footsteps going upstairs. Shortly thereafter, he heard 'the[m] come right back to the same spot that [he] hear[d] the noise before and . . . then they turn[ed] around and [went] back outside.'

"At approximately 4 a.m. on December 14, 1992, Michael Fusaro, an emergency medical technician for the Bridgeport Ambulance Service, was driving an ambulance in Bridgeport with his partner, John Corris, when they were stopped by a man and a woman holding a baby, the victim. Fusaro called the dispatcher to let them know what was going on and then proceeded to assist Corris, who had initiated care to the victim. They then transported the victim to the hospital. The woman sat in the front seat of the ambulance and explained that they had decided to run to the hospital, which was only two or three blocks away, because the victim was crying and having trouble breathing.

"Corris knew the condition of the victim was poor because of her limp state and because her face was blue, indicating that the victim was not breathing. After removing the victim's snowsuit, Corris noticed that the victim had no pulse. Corris also noticed that 'the eyes were . . . discolored like bruises around the orbits of the eyes,' which he called a 'clinical sign of injury,' usually indicative of head trauma. Corris put a tube into the victim's lungs, put her on a heart monitor, and gave her some medication. They also performed [cardiopulmonary resuscitation] on the victim. The victim was placed on a board for the drive to the hospital.

"The victim was treated in the emergency room of Bridgeport Hospital by Deborah Spaight, a pediatric resident. Spaight noticed that the victim was not breathing on her own and was not moving. Spaight also noticed that the victim had some bruising over both eyes, her cheek, the left side of her neck and on her chest. Spaight saw a cut that appeared to be healing on the left part of the victim's upper lip. In Spaight's opinion, the bruises were more than twelve hours old. A physical examination revealed that the victim had some bleeding behind the eyes, which is usually associated with a severe head injury. The victim had a [computerized axial tomography (CAT)] scan of her head which showed evidence of a skull fracture with associated bleeding inside her brain. The victim was removed from life support at 5 p.m. on December 14, 1992, and died shortly thereafter.

"As a result of her examination of the victim, Spaight filed a report of suspected child abuse with the state department of social services. She did this on the basis of the severity of the head injury, the evidence of old bruises and the fact that the story from Bruno did not appear to be consistent with the victim's injuries. In Spaight's opinion, the defendant's statement also was inconsistent with the victim's injuries and the cause of the victim's death, which was cardiopulmonary arrest [that] was caused by the head injury. A postmortem X ray of the victim taken by Malka Shah revealed a healing fracture of the victim's right upper leg that would have been caused by a 'tremendous amount of force.' In Shah's opinion, the fracture was a minimum of two weeks old, and probably occurred after the victim's videotaped examination on November 16, 1992.[7]

---

[7] "On cross-examination, Shah admitted that it was possible that the fracture was four months old. This is consistent with the testimony of the defense experts, who opined that the fracture occurred between three and four months prior to the victim's death." *State* v. *Delgado*, supra, 42 Conn. App. 388 n.5.

"The defendant testified that the victim slept on a mattress in the kitchen, that there were stuffed animals around the mattress to prevent the victim from hitting the wall, and that the victim would often roll off the mattress during the night and lie on the floor. According to the defendant, the victim had the habit of banging her head on the floor. The defendant testified that when the victim returned from the hospital after receiving shots on November 16, she would not let anybody touch her. This behavior lasted for approximately a week and a half. He also testified that the victim's leg had been very swollen.

"With regard to the victim's death in the early morning hours of December 14, 1992, the defendant testified as follows. He stayed up until approximately 2 a.m. watching television in his bedroom. Between 3:30 and 4 a.m., the defendant was awakened by the victim's crying, and he went to the kitchen and saw the victim lying on the floor. He gave her a pacifier and a toy and then went back to the bedroom. About five minutes later, the victim started crying again, and when the defendant went back to the kitchen, he saw the victim lying on her back and thought that she was choking on something. He dropped to his knees, grabbed the back of the victim's neck, squeezed her cheeks and attempted to perform mouth-to-mouth resuscitation. He then put the victim under cold water in the sink. When he realized that none of his efforts were working, he woke up Bruno, and together they tried to revive the victim. Eventually, they got dressed and started running to the hospital. En route, they flagged down an ambulance, which then took Bruno and the victim to the hospital. The defendant testified that he was not aware, when the victim went to the hospital, that she had a head injury." *State* v. *Delgado*, supra, 42 Conn. App. 384–89.

In light of this evidence, the jury returned a verdict of guilty of manslaughter in the first degree and risk of

injury to a child. On appeal, the defendant claimed that
"the evidence presented by the state on the manslaugh-
ter count was bolstered and shored up by the risk of
injury count, thereby resulting in substantial prejudice";
id., 393; and, therefore, that the trial court improperly
had refused to sever the trial of those counts. The Appel-
late Court agreed and reversed the judgment of the
trial court. The state maintains that the judgment of
conviction should be affirmed because the trial court
acted within its discretion by consolidating the counts
for trial. We agree with the state.

"General Statutes § 54-57[8] and Practice Book § 829[9]
expressly authorize a trial court to order a defendant
to be tried jointly on charges arising separately. In
deciding whether to sever informations joined for trial,
the trial court enjoys broad discretion, which, in the
absence of manifest abuse, an appellate court may not
disturb. . . . The defendant bears a heavy burden of
showing that the denial of severance resulted in sub-
stantial injustice and that any resulting prejudice was
beyond the curative power of the court's instructions.
. . . [W]hether a joint trial will be substantially prejudi-
cial to the rights of the defendant . . . means some-
thing more than that a joint trial will be less
advantageous to the defendant. . . ." (Internal quota-
tion marks omitted.) *State* v. *Cassidy*, 236 Conn. 112,
132–33, 672 A.2d 899, cert. denied, 519 U.S. 910, 117 S.
Ct. 273, 136 L. Ed. 2d 196 (1996); see *State* v. *Chance*,
236 Conn. 31, 37–38, 671 A.2d 323 (1996).

---

[8] General Statutes § 54-57 provides: "Joinder of offenses of the same char-
acter. Whenever two or more cases are pending at the same time against
the same party in the same court for offenses of the same character, counts
for such offenses may be joined in one information unless the court
orders otherwise."

[9] Practice Book § 829 provides: "Trial Together of Informations

"The judicial authority may, upon its own motion or the motion of any
party, order that two or more informations, whether against the same defen-
dant or different defendants, be tried together."

"We recognize that an improper joinder may expose a defendant to potential prejudice for three reasons. First, when several charges have been made against the defendant, the jury may consider that a person charged with doing so many things is a bad [person] who must have done something, and may cumulate evidence against him . . . . Second, the jury may have used the evidence of one case to convict the defendant in another case even though that evidence would have been inadmissible at a separate trial. . . . [Third] joinder of cases that are factually similar but legally unconnected . . . present[s] the . . . danger that a defendant will be subjected to the omnipresent risk . . . that although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all." (Internal quotation marks omitted.) *State* v. *Atkinson*, 235 Conn. 748, 763, 670 A.2d 276 (1996); see *State* v. *Horne*, 215 Conn. 538, 546–47, 577 A.2d 694 (1990). Nevertheless, because joinder "foster[s] economy and expedition of judicial administration"; *State* v. *Greene*, 209 Conn. 458, 462, 551 A.2d 1231 (1988); we consistently have recognized a clear presumption in favor of joinder and against severance; *State* v. *Chance*, supra, 236 Conn. 38; *State* v. *Jones*, 234 Conn. 324, 344, 662 A.2d 1199 (1995); and, therefore, absent an abuse of discretion, we will not second guess the considered judgment of the trial court as to the joinder or severance of two or more charges.

The court's discretion regarding joinder, however, is not unlimited; rather, that discretion must be exercised in a manner consistent with the defendant's right to a fair trial. Consequently, we have identified several factors that a trial court should consider in deciding whether a severance may be necessary to avoid undue prejudice resulting from consolidation of multiple charges for trial. "These factors include: (1) whether the

charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Internal quotation marks omitted.) *State* v. *Cassidy*, supra, 236 Conn. 133; see *State* v. *Chance*, supra, 236 Conn. 42–43; *State* v. *Boscarino*, 204 Conn. 714, 722–24, 529 A.2d 1260 (1987). Upon application of these factors to this case, we are persuaded, contrary to the conclusion of the Appellate Court, that the trial court was not required to sever the trial of the two counts.

First, the counts were not so similar as to create a significant risk of confusion or prejudice. With respect to the manslaughter count, the state established that the defendant had committed the crime on a specific date and time, namely, December 14, 1992, at approximately 4 a.m. With respect to the risk of injury count, the state proved that the defendant's illegal conduct spanned a period of six weeks, from November 1, 1992, until December 14, 1992. Moreover, the state's evidence on the manslaughter count demonstrated that the defendant had *actively engaged* in conduct *that caused the victim's death*; by contrast, the state's evidence proved that the defendant had committed the crime of risk of injury by *allowing the victim to be placed in a situation* inimical to her health. Finally, the evidence adduced by the state in support of the manslaughter count indicated that the cause of death was a fractured skull, whereas the evidence presented by the state to prove the risk of injury count established that the victim had suffered facial cuts and bruises and a leg injury. Thus, the crimes were committed in fundamentally different time frames, involved fundamentally different conduct, and resulted

in fundamentally different injuries.[10] Under the circumstances, we disagree with the Appellate Court that the two counts did not involve discrete and distinguishable factual scenarios.[11]

With respect to the second factor, we acknowledge that the injuries inflicted on the victim, and especially the head injuries that resulted in her death, are shocking. We disagree with the defendant's contention, however, that joinder of the counts seriously prejudiced his defense of the manslaughter count.[12] In light of the state's claim regarding the risk of injury count, namely,

[10] Although the two crimes involved the same victim, we have never concluded that that fact alone necessarily renders the crimes so interrelated as to require a severance. On the contrary, we have expressly indicated that there are circumstances when multiple crimes properly may be joined for trial even though the offenses involved the same victim. See, e.g., *State* v. *Jennings*, 216 Conn. 647, 658–59, 583 A.2d 915 (1990) (holding that joinder of two assault charges involving same victim was proper).

[11] It is true that many of the same witnesses testified regarding both the manslaughter and the risk of injury counts. Because the factual scenarios underlying the two crimes were separate and distinct, however, we are not convinced that the jury likely was confused by that testimony.

We also disagree with the dissent's contention, which was not asserted by the defendant, that at trial, the assistant state's attorney acknowledged that the counts "did not involve distinguishable factual scenarios." See footnote 3 of the dissent. The assistant state's attorney's comments merely noted that the state intended to use the same witnesses, and that the counts involved the same victim and, to a limited extent, the same time period.

[12] Contrary to the assertion of the dissent, the defendant has not claimed, either in the Appellate Court or in this court, that the manslaughter evidence unduly prejudiced his defense of the risk of injury count. As the Appellate Court expressly stated, and as we have noted, the defendant claimed on appeal to the Appellate Court that "the evidence presented by the state on the manslaughter count was bolstered and shored up by the risk of injury count, thereby resulting in substantial prejudice . . . ." *State* v. *Delgado*, supra, 42 Conn. App. 393. The defendant makes precisely the same argument on appeal to this court, claiming that "[t]he evidence introduced [by the state] for the purposes of convicting the defendant under the risk of injury charge . . . undoubtedly served to inflame the passions and sensibilities of the jurors regarding the manslaughter count and thereby prejudiced the defendant's right to a fair trial." The dissent, quoting from the defendant's brief, would have us believe that the defendant has also raised a claim that the manslaughter evidence unfairly prejudiced his ability to defend against

that the defendant had failed to take action to protect the victim from physical abuse by another person, the evidence adduced in support of that count was not so likely to incite the passions of the jury that it could not render a fair and objective verdict on the manslaughter count. See, e.g., *State* v. *Herring*, 210 Conn. 78, 97, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989) ("[w]hile any murder involves violent and upsetting circumstances, it would be unrealistic to assume that any and all such deaths would inevitably be so 'brutal and shocking' that a jury, with proper instructions to treat each killing separately, would necessarily be prejudiced by a joint trial"); *State* v. *Hilton*, 45 Conn. App. 207, 215–16, 694 A.2d 830 (1997) (same). This is especially true because the conduct underlying the manslaughter count is more repugnant than that underlying the risk of injury count.

In addition, the trial court instructed the jury that each count was a separate offense and, therefore, that the jury was required to consider them individually. Specifically, the trial court, prior to commencing voir dire, stated that "[e]ach count is a separate crime and must be proved by the state individually beyond a reasonable doubt." In its final charge, the court reminded the jury that "[e]ach count is a separate crime and you must consider them separately in your deliberations." The trial court thereafter reiterated that "each and every count is a charge of a separate crime and must be proved individually and separately beyond a reasonable doubt." Moreover, the defendant failed to request any further cautionary instruction regarding the separate nature of the counts and the evidence adduced in support thereof. In particular, the defendant did not request an instruction expressly informing the jury that it was

the risk of injury count. This assertion, which is based on general statements that the dissent has taken out of context from the introductory and conclusory paragraphs of the defendant's brief, is simply inaccurate.

prohibited from considering the risk of injury evidence in its deliberations on the manslaughter count.[13] Furthermore, the defendant took no exception to the charge as given. We are not persuaded, therefore, that the joinder of the two counts for trial created an undue risk that the jury would consider the evidence of one crime in its deliberations on the other.[14]

Finally, the trial, which lasted eleven days and involved the testimony of twenty-five witnesses, was not unusually lengthy or complex. In this respect, this case closely resembles *State* v. *Herring*, supra, 210 Conn. 97, an eight day double murder case that involved testimony from twenty-three witnesses. In *Herring*, we concluded that neither the duration of the trial nor its complexity created a sufficient risk of jury confusion to require a severance of the two murder counts. Id.; compare *State* v. *Boscarino*, supra, 204 Conn. 722–24 (consolidated trial of four factually similar but legally unrelated cases, which took ten weeks to complete

---

[13] In light of the fact that the state, at the time of trial, did not claim that the risk of injury evidence was admissible to prove the manslaughter count, it would have been preferable for the trial court expressly to have informed the jury that the evidence adduced by the state on either one of the two counts was not admissible as proof of the other and, further, that the two cases had been consolidated solely for purposes of judicial economy. We believe that such a charge is appropriate, even if a defendant fails to request it expressly, because it serves to underscore for the jury that it must consider the two counts separately. The defendant in this case, however, has not claimed that the trial court's failure so to instruct the jury constituted plain error, nor has he established that the instructions given by the trial court were constitutionally defective.

[14] The state maintains that, in any event, the risk of injury evidence would have been admissible at a separate trial on the manslaughter count to prove intent and motive, and to place the crime in the context of nearby and nearly contemporaneous happenings; see, e.g., *State* v. *Ali*, 233 Conn. 403, 427, 660 A.2d 337 (1995); and, consequently, that separate trials would have provided the defendant with no significant benefit. See, e.g., *State* v. *Atkinson*, supra, 235 Conn. 765. In light of our conclusion that the defendant has not met his heavy burden of demonstrating that joinder of the two counts resulted in substantial injustice, we need not decide whether the risk of injury evidence would have been admissible at a separate trial on the manslaughter count.

and involved testimony from fifty-five witnesses, was of such duration and complexity as to create high risk of prejudice). Moreover, although the evidence adduced by the state in this case was essentially circumstantial, neither the issues nor the evidence was unduly complicated. In these circumstances, we do not believe that either the length of the trial or the nature of the evidence presented created a likelihood of jury confusion.

We conclude, therefore, that the defendant has failed to meet his heavy burden of demonstrating that joinder of the risk of injury and manslaughter counts resulted in substantial injustice.[15] Accordingly, we disagree with the Appellate Court that the trial court's denial of the defendant's severance motion entitles him to a new trial.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to consider the defendant's remaining claims on appeal.

---

[15] The dissent's assertion that our determination of this case "sets a new standard for consolidating trials"; see p. 551 of the dissent; is entirely unwarranted. Contrary to the dissent's claim, our resolution of this case is based on well established principles, the propriety of which the defendant has not challenged. Moreover, we reiterate that a trial court's discretion regarding the joinder of cases for trial must be exercised carefully and cautiously, with due regard for the fair trial rights of the defendant. Thus, the fact that the decision whether to consolidate the counts in a criminal case may be a "close call"; see p. 551 of the dissent; does not, as the dissent suggests, require a different result; as long as a trial court properly exercises its discretion regarding joinder, we will not reverse its considered judgment.

In addition, we are mystified by the dissent's "problem" regarding the import of the trial court's jury instructions to consider the cases separately. See footnote 12 of the dissent. As we have explained, we are persuaded that, upon application of the *Boscarino* factors, the trial court *did not improperly consolidate* the two cases for trial. In these circumstances, and in the absence of a specific request to charge from the defendant regarding the separate nature of the counts, we cannot say that the trial court's cautionary instructions on that issue were inadequate.

Finally, the dissent mischaracterizes the thrust of the state's argument regarding the presence of the *Boscarino* factors. See footnote 13 of the dissent. Suffice it to say that the state has never suggested, either implicitly

In this opinion BORDEN, NORCOTT and MCDON-
ALD, Js., concurred.

BERDON, J., dissenting. The certified issue in this
appeal is whether the trial court abused its discretion
in allowing the joinder of the crimes of risk of injury
to a child and manslaughter in the first degree with
regard to that same child.[1] But the issue in this case
is, however, more appropriately restated as follows:
whether the trial court abused its discretion by joining
for trial purposes before a jury, for the purported pur-
pose of "foster[ing] economy and expedition of judicial
administration,"[2] two counts accusing the defendant,
Rafael Delgado, of brutal, shocking and outrageous con-
duct—in the first count accusing the defendant of com-
plicity with respect to the abuse of the child and in the
second count accusing him of causing the death of that
child. We have long held that judicial economy, although
important, can never trump the doing of justice. See
*State* v. *Oliver*, 161 Conn. 348, 360–62, 288 A.2d 81
(1971). Because I consider the joinder of the counts in
this case to have deprived the defendant of a fair trial,
I would affirm the judgment of the Appellate Court.

Although the joinder of charges for trial is permitted
by statute and by the rules of practice; General Statutes
§ 54-57; Practice Book § 829; and serves the purpose of
preserving precious judicial resources, we have recog-
nized that in some cases, joinder can be highly prejudi-
cial. *State* v. *Boscarino*, 204 Conn. 714, 722, 529 A.2d

---

or otherwise, that its position with respect to joinder is "tenuous"; that
conclusion is the dissent's, and the dissent's alone.

[1] The defendant was charged with three crimes, one count of risk of
injury to a child in violation of General Statutes § 53-21, and two counts of
manslaughter in the first degree in violation of General Statutes § 53a-55
(a) (1) and (3). Of course, he could not be found guilty of both manslaughter
charges. The jury found him guilty of risk of injury to a child and manslaugh-
ter in the first degree in violation of § 53a-55 (a) (1).

[2] *State* v. *Greene*, 209 Conn. 458, 462, 551 A.2d 1231 (1988).

1260 (1987). Accordingly, this court adopted in *Boscarino* three factors to be considered in determining whether there was an abuse of judicial discretion in ordering joinder: (1) whether the charges were not discrete and easily distinguishable; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) whether the trial was lengthy or complex. Id., 722–23. If any *one* or more of these factors are present, an appellate court is then required to determine "whether the trial court's jury instructions cured any prejudice that might have occurred." (Internal quotation marks omitted.) *State* v. *Cassidy*, 236 Conn. 112, 133, 672 A.2d 899, cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996). In my view, all three *Boscarino* factors are *shockingly* present in this case and the jury instructions did not cleanse the taint of the improper joinder of the charges for trial. See *State* v. *Horne*, 215 Conn. 538, 551–53, 577 A.2d 694 (1990).

First, the crimes of risk of injury to a child and manslaughter in the first degree in the present case did not involve discrete, easily distinguishable factual scenarios. The "alleged crimes are so similar in time, place and circumstance, there is a danger that the jury may [have used] evidence of one crime to convict the defendant of the other [crime]." *State* v. *Crosby*, 36 Conn. App. 805, 809, 654 A.2d 371, cert. denied, 232 Conn. 921, 656 A.2d 669 (1995). Indeed, the state's attorney argued before the trial court that the counts involved the same time period, the same victim and the same location.[3] The

---

[3] The majority incredibly concludes that the crimes charged were discrete and involved distinguishable factual scenarios. I obviously read a different record than the majority. Indeed, as the Appellate Court pointed out, even the state's attorney, before the trial court, acknowledged—at the time he opposed the severance of these charges—that they did not involve distinguishable factual scenarios. The state's attorney argued for joinder before the trial court because "we have the same victim involved in all three counts. We have the same location involved in all three counts. We have the same victim but also roughly the same time period involved in all three counts.

Appellate Court concluded that "both counts involve allegations of physical abuse inflicted on the victim over a continuous period of time." *State* v. *Delgado*, 42 Conn. App. 382, 395, 681 A.2d 327 (1996). The risk of injury to a child count was predicated on the "deliberate indifference to, acquiescence in, or the creation of situations inimical to the minor's moral or physical welfare . . . ." (Internal quotation marks omitted.) Id., 392. The resulting injuries of a broken leg, severe bruises, cuts, and bumps were observed on several occasions between November 1 and December 14, 1992, and on the night of December 14, 1992. The manslaughter count was predicated on the child receiving a fatal skull fracture on December 14, 1992.

In this case, unlike many other joinder cases involving separate or multiple victims in separate incidents that

---

While the first two counts specifically focus on December 14 of 1992, which is the date that the victim in this particular case, the state believes, suffered the head injury—the fractured skull which thereby led to her death, the risk of injury covers the time before that—November 1 to December 14. *So we basically have the same time period involved.* As part of that, the state intends to produce evidence of the child's condition when seen by medical personnel in November, 1992, which goes back to the risk of injury charge.

\* \* \*

"I would also note the state believes the witnesses will be the same for both in this case—the two charges. It just doesn't make any sense *when the evidence is basically the same and the risk of injury charge necessarily involves what happened on the night of December 14 including his conduct on that particular evening.*" (Emphasis altered; internal quotation marks omitted.) *State* v. *Delgado*, 42 Conn. App. 382, 394–95 n.10, 681 A.2d 327 (1996).

The state concluded its argument for joinder with the following remark: *"So the evidence I submit would be the same for both charges given the same victim, same location and the same time period."* (Emphasis added.)

The state's attorney in this case kept his promise with respect to the order in which the witnesses testified and to the commingling of the evidence pertaining to the risk of injury and manslaughter charges. See footnotes 5 and 6 of this dissent. Joinder allowed the state to expose the jury to "the evidence of one case to convict the defendant in another case even though that evidence would have been inadmissible at a separate trial." (Internal quotation marks omitted.) *State* v. *Atkinson*, 235 Conn. 748, 763, 670 A.2d 276 (1996).

passed muster under the *Boscarino* factors, there was only one victim.[4] See *State* v. *Chance*, 236 Conn. 31, 671 A.2d 323 (1996) (many arson victims, one assault victim); *State* v. *Herring*, 210 Conn. 78, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989) (two murder victims); *State* v. *Stevenson*, 43 Conn. App. 680, 686 A.2d 500 (1996), cert. denied, 240 Conn. 920, 692 A.2d 817 (1997) (four sexual assault victims); *State* v. *Snead*, 41 Conn. App. 584, 677 A.2d 446 (1996) (one assault victim, two threatened police officers); *State* v. *Crosby*, supra, 36 Conn. App. 805 (one murder victim, one sexual assault victim, one assault victim). The defendant in the present case was also alleged to have committed each of the offenses in the same location—his apartment—in the presence of the child's mother.

Furthermore, in many of the joinder cases decided since *Boscarino*, our appellate courts have concluded that the counts involved discrete and distinguishable factual scenarios partly because, unlike this case, the state had presented its evidence in an orderly fashion, and kept the evidence for the counts separate at trial. See *State* v. *Jennings*, 216 Conn. 647, 659, 583 A.2d 915 (1990) (state presented different eyewitnesses to testify to each incident, and treated two cases separately during examination of witnesses and during closing argument); *State* v. *Frazier*, 39 Conn. App. 369, 375, 665

---

[4] Although the majority relies on *State* v. *Jennings*, 216 Conn. 647, 583 A.2d 915 (1990), it is totally inapposite to this case. The court held in *Jennings:* "Although the victim was the same in each case, the factual circumstances were different. One case involved a physical attack upon the victim in a parking lot and an abduction to an empty apartment. The other case involved a less serious altercation between the defendant and the victim in the home of the victim's niece. The wounds suffered by the victim were of differing character and severity. The victim sustained bruising and deep knife wounds in the parking lot incident while she sustained comparatively minor, superficial cuts in the incident at her niece's home. . . . Thus, the distinctiveness of the factual scenarios made it unlikely that the jurors would confuse the two cases." (Citation omitted.) Id., 658–59.

A.2d 142 (1995) ("state . . . presented a chronologically ordered case in which the jury could distinguish one factual scenario from another"); *State* v. *Jones*, 37 Conn. App. 437, 447, 656 A.2d 696, cert. denied, 233 Conn. 915, 659 A.2d 186 (1995) ("severance was not required . . . because the state presented its evidence in a clear, comprehensive and straightforward manner" [citation omitted]); *State* v. *Crosby*, supra, 36 Conn. App. 810 (evidence was organized chronologically and presented logically, not commingled); *State* v. *King*, 35 Conn. App. 781, 793, 647 A.2d 25 (1994), aff'd, 235 Conn. 402, 665 A.2d 897 (1995) ("orderly manner in which the state presented the evidence . . . had the effect of clearly distinguishing the evidence . . . applicable to each count"). In *State* v. *Chance*, supra, 236 Conn. 43, this court pointed out that the discreteness of the joined counts was enhanced because of "the trial court's order requiring that evidence [of one count] be presented first, followed by evidence [on the second count]."

In the present case, the state did not keep separate the evidence relating to the two counts of risk of injury to a child and manslaughter.[5] Indeed, the state's medical

---

[5] In its case-in-chief, the state presented the testimony of seventeen witnesses. The following list of witnesses, in the chronological order in which they were called, demonstrates that the state was unable to keep the evidence for the two counts separate at trial. The subject matter of each witness' testimony is included in parentheses.

  (1) Paula Mancini, friend of child's mother (risk of injury)
  (2) Pauline Barnes, neighbor in downstairs apartment (manslaughter)
  (3) Benjamin Barnes, neighbor (manslaughter)
  (4) Detective John Whalen (manslaughter)
  (5) Deborah Messina, forensic lab technician (manslaughter)
  (6) Detective Paul Lengyel (manslaughter)
  (7) Fred Beitman, landlord (manslaughter and risk of injury)
  (8) Michael Fusaro, emergency medical technician for Bridgeport Ambulance Service (manslaughter and risk of injury)
  (9) John Corris, emergency medical technician for Bridgeport Ambulance Service (manslaughter and risk of injury)
  (10) Detective Giselle Doszpoj (manslaughter)
  (11) Malka Shah, associate medical examiner for the office of the chief medical examiner (manslaughter and risk of injury)

witnesses testified to issues arising under both counts. Such commingling of medical testimony concerning the two critical issues in the defendant's case—the precise cause of the child's death and whether the defendant acquiesced in the abuse of the child—presented a "legitimate concern that the jury [could not distinguish] the facts or charges stemming from these two events."[6]

(12) Tammy Vargas, pediatric resident at St. Joseph's Family Medical Center (risk of injury)

(13) Deborah Spaight, pediatric resident in Bridgeport Hospital emergency room (manslaughter and risk of injury)

(14) Michelle Bruno, child's aunt (risk of injury)

(15) Kieve Berkwits, senior attending physician for the department of pediatrics at Bridgeport Hospital (manslaughter)

(16) Sheila Collins, nurse at St. Joseph's Family Medical Center (risk of injury)

(17) Regina Featherston, nutritionist for Women, Infants and Children (WIC) program in Norwalk (risk of injury)

[6] The majority defensively claims that "the factual scenarios underlying the two crimes were separate and distinct," but that misunderstands the *Boscarino* test. The discreteness factor of the *Boscarino* test also requires, and importantly so, a determination of whether the relevant evidence could have been and was presented on each count separately in order to avoid the commingling of the evidence so that it was less likely that the jury would be influenced in deciding one count by the evidence that was solely admissible in the other count. The following excerpt from the state's attorney's direct examination of Malka Shah, associate medical examiner for the state of Connecticut who performed an autopsy on the child, is an illustrative example of that precise danger—that the evidence presented to the jury was commingled in such a manner that there was a likelihood that the evidence relevant with respect to one count may have influenced the jury on the other count.

"[Stephen J. Sedensky III, Assistant State's Attorney]: What signs of injury did you see as a result of your examination [of the child]?

"[Shah]: She did not have any injury in her chest, abdomen or neck organs. However, she did have injuries on her head.

"Q. Where were the injuries on her head?

"A. She had a hemorrhage on the left back of her scalp or the skin of her head. She also had a fracture of the skull on the left side. She also had a hemorrhage which was present around the brain, itself . . . .

"Q. As a result of that examination, were you able to determine what the cause of her death was?

"A. Yes, I was.

"Q. And what did you determine was the cause of her death?

*State* v. *Atkinson*, 235 Conn. 748, 764, 670 A.2d 276 (1996).

"A. The cause of her death was head injury.

"Q. When you say head injury, what do you mean?

"A. Head injury means it's a fracture of the skull with subdural and subarachnoid hemorrhage. All of that caused her death.

\* \* \*

"Q. Now, what injury did you detect to the right leg?

"A. The right leg is not as straight as the left leg. . . . It's broken. . . . The fractured ends are dislocated, which indicates this has not been treated because if there was a treatment then they would be in a straight line.

\* \* \*

"Q. Can you tell us at a minimum how old that fracture—that broken leg is?

"A. It's a minimum of two weeks old—the fracture is.

\* \* \*

"Q. Doctor, showing you what has been marked as State's Exhibit S, a videotape, did you have a chance to review that videotape?

"A. Yes, I did.

"Q. And did you have a chance to observe [the child] in that videotape?

"A. Yes, I did.

"Q. . . . [C]an you give us any information with regard to the healing leg fracture based on that—what you saw with regard to [the child's] leg in that videotape?

"A. In the video, [the child] does not show any deformity at all on her right leg. . . . From looking at [the videotape], it looks like she does not have any bodily injuries on her.

"Q. If this injury had occurred before November 16, how long before November 16 would it have to have occurred?

"A. For the Doctor not to notice it, it would have to have occurred at least two weeks and before that—so that it had healed, the swelling . . . .

"Q. Now, based on your review of the videotape and those [medical] records [State's Exhibit Q], would it be your opinion that the break to the leg took place before or after November 16, 1992?

"A. I would say after November 16, 1992. . . .

"Q. With regard to the bruises that you saw on the left side of [the child's] face, can you just tell us where those were again?

"A. They were present—two of them were present on her jaw and three of them were present on the upper shoulder and neck area. . . .

"Q. Can you tell us what kind of mechanism or type of injury could have caused that type of bruise on the cheek?

"A. They're small circular looking bruises. Many a time if the child has been handled roughly, with the finger[tips], it could be—or with the fingers, that can give you like that kind of injuries or even pinching of the face and cheek area can give you that kind of hemorrhages."

The prejudicial impact is further underscored in this case because there was no direct evidence to implicate the defendant in either the risk of injury to a child count or the manslaughter count. Since no eyewitnesses testified,[7] the state's proof consisted of the testimony of medical personnel who observed the injuries before and on December 14, 1992, and the fatal skull fracture that occurred on December 14, 1992. Therefore, in order to find the defendant guilty on both counts, the jury was required to draw inferences based solely on the fact that he resided in the same apartment as that of the child victim and that he was present when the child received the injury to her skull that caused her death.[8]

Second, the two counts alleged "brutal or shocking conduct" on the defendant's part. The defendant's claim that the joinder prejudiced him is based on his legitimate fear that the jury, under the circumstances of this case, might have used "evidence of one to find guilt in the other." *State* v. *Stevenson*, supra, 43 Conn. App. 688. He does not claim, despite the majority's reliance on the Appellate Court's one sentence reference, that the joinder prejudiced him only as to the manslaughter count. See *State* v. *Delgado*, supra, 42 Conn. App. 393. Rather, he claims, as argued in his brief, that "[b]y consolidating the two cases, the trial court required the jury to undertake the difficult if not impossible task of listening to two somewhat similar cases against the defendant, and yet ignore . . . the inflammatory nature of the allegations of abuse and the alleged cause of the victim's death."[9] This court must thus consider

---

[7] The child's mother did not testify at trial.

[8] Although the defendant challenged the sufficiency of the evidence before the Appellate Court, this court did not certify that issue for review on appeal. *State* v. *Delgado*, 239 Conn. 920, 682 A.2d 1008 (1996).

[9] I disagree with the majority that the defendant never claimed "that the manslaughter evidence unduly prejudiced his defense of the risk of injury count." Rather than resort to the defendant's brief as to his claims, the majority culls one sentence out of the Appellate Court opinion for support of its claim. The defendant argued that he was prejudiced by the joinder

the nature of both counts to determine if one or both involved such "brutal or shocking conduct"; *State* v. *Boscarino*, supra, 204 Conn. 722; that it "inevitably infected the jury's fair consideration of the other [count]." *State* v. *Horne*, supra, 215 Conn. 549.

Under anyone's sense of morality, the allegations forming the basis of the risk of injury count—that the defendant acquiesced in the beating or cruel treatment of a sixteen month old child, afflicted with Down's Syndrome, over a period of time—and the allegations forming the basis of the manslaughter count—that the defendant caused that child to suffer a fractured skull that resulted in the child's death—concern brutal and shocking conduct.[10] One factor leading to our conclusion in *Horne* that the counts involved brutal and shocking conduct was that the "victim was a *complete*

---

without limitation of one count with respect to the other. He begins his argument in his brief with the following introductory paragraph: "The trial court erred in allowing the joinder of the manslaughter and the risk of injury charges; the two charges did not involve discrete, easily distinguishable factual scenarios, the manslaughter count alleged brutal or shocking conduct and the trial court's brief instruction to keep the counts separate from one another was not sufficient to stem the prejudice caused by the joinder. That prejudice derived from the fact—as found by the Appellate Court—that the evidence did *not* involve discrete, easily distinguishable factual scenarios and that, given the trial court's parlous instructions, the jury probably commingled the evidence of one case with another and was inflamed by the brutal and shocking allegations of abuse and subsequent death of an infant afflicted with Down's Syndrome. In short, the defendant suffered substantial prejudice which made it impossible for him to receive a fair trial." (Emphasis in original.)

The defendant argues that he was prejudiced by the joinder in the remaining pages of his brief without limitation to any one count, and he ends his discussion with the conclusion that "[b]y consolidating the two cases, the trial court required the jury to undertake the difficult if not impossible task of listening to two somewhat similar cases against the defendant, and yet ignore . . . the inflammatory nature of the allegations of abuse and the alleged cause of the victim's death."

[10] The majority concedes, as it must, that "the injuries inflicted on the victim, and especially the head injuries that resulted in her death, are shocking." Notwithstanding its concession of the presence of shocking conduct that satisfies the second *Boscarino* factor, the majority ignores the remaining

*innocent* who was forced at gunpoint behind the store counter and made to lie face down on the floor while the assailant took cash from the store's cash drawer and took a bank card from her purse. Then . . . the assailant stripped off her clothes and sexually assaulted her." (Emphasis added.) Id. I cannot think of a more innocent victim than a sixteen month old child, afflicted with a disability; she too was made to suffer terribly at the hands of her assailant. As we stated in *Horne,* "[b]y any barometer of human behavior, [the defendant's alleged conduct in regard to both counts] constitutes 'shocking conduct' that inevitably infected the jury's fair consideration of [one of the counts]." Id.

"Joinder gave the state the opportunity to present the jury with the intimate details of each of these offenses, an opportunity that would have been unavailable if the cases had been tried separately." *State* v. *Boscarino,* supra, 204 Conn. 723. At trial in this case, the state presented detailed testimony of more than six medical professionals concerning the injuries sustained by the child, including written and videotaped exhibits that demonstrated the extent of her injuries. At least one witness testified that the child's fatal injury was caused by a tremendous amount of force and likened it to a fall from fifteen feet. For the majority to conclude that this medical testimony "is not likely to incite the passions of the jury" is simply incredible, when the state sought to have the jury infer from that evidence that the defendant "failed to take action to protect" the child from physical abuse by another over a period of time, and that the defendant brutally caused the death of the child.

Third, the evidence the state presented in regard to the risk of injury to a child and manslaughter counts

analysis required by *Boscarino*—that is, whether the two sentence instruction of the trial court was sufficient to cure the improper joinder. See footnotes 11 and 12 of this dissent.

was complex. The state never presented any direct evidence to support either count. Because there were no eyewitnesses, the state relied primarily on the observations and theories of medical professionals and on the fact that the child resided in the same apartment with the defendant. The medical professionals who testified at the defendant's trial—pediatric residents, pediatric neurologists, medical examiners and diagnostic radiologists—gave highly technical testimony supporting their respective theories of the cause of the child's injuries. Ordinarily, such extensive medical testimony aids the jury in filling the gaps that may exist from the lay witness testimony. In this case, however, where there was no direct evidence, the jury was left to draw inferences from the inferences drawn by the medical professionals.

The majority's conclusion that the sparse reference in the jury charge that "[e]ach count is a separate crime and you must consider them separately in your deliberations" would cure an improper joinder is not only unrealistic, but is contrary to our precedent.[11] In *State* v. *Horne*, supra, 215 Conn. 551–53, this court held that a substantially more extensive instruction could not protect the defendant by asking "the jury somehow to ignore the obviously inflammatory nature and impact of [the crimes]." Id., 552. This court, in *State* v. *Tinsley*, 180 Conn. 167, 170, 429 A.2d 848 (1980), recognized that in certain instances when the evidence is inflammatory it would be fiction to believe that a juror could put

[11] The majority states that "the trial court instructed the jury that each count was a separate offense and, therefore, that the jury was required to consider them individually." On two occasions, the trial court issued a one sentence instruction to the impaneled jury that the counts were to be treated separately. Those instructions were as follows: "[e]ach count is a separate crime and you must consider them separately in your deliberations," and "each and every count is a charge of a separate crime and must be proved individually and separately beyond a reasonable doubt." The majority would lead a reader into believing that these instructions were extensive, but, as indicated, both were sparse one sentence instructions.

aside evidence he or she heard that is relevant only on one count when considering the guilt or innocence of a defendant on another count. Indeed, in *Boscarino*, this court stated "that even the trial court's apt and thorough admonitions could not mitigate the potential for prejudice wrought by the joinder of the cases against the defendant." *State* v. *Boscarino*, supra, 204 Conn. 725. " 'It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information. Nevertheless, as was recognized in *Jackson* v. *Denno* [378 U.S. 368, 388–91, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964)], there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.' *Bruton* v. *United States*, 391 U.S. 123, 135, 88 S. Ct. 1627, 20 L. Ed. 2d 476 (1968). 'The government should not have the windfall of having the jury be influenced by evidence against a defendant which, as a matter of law, they should not consider but which they cannot put out of their minds.' *Delli Paoli* v. *United States*, 352 U.S. 232, 248, 77 S. Ct. 294, 1 L. Ed. 2d 278 (1957) [Frankfurter, J., dissenting], cited with approval in *Bruton* v. *United States*, supra, 129." *State* v. *Tinsley*, supra, 170–71.[12]

[12] The majority defensively claims that it is deciding this case "on well established principles." I do not quarrel with the "well established principles" set forth in *Boscarino*. My problem is the result oriented application of these principles. The majority opinion, as it must, concedes that the allegations of the injuries inflicted upon the sixteen month old victim under both counts are shocking—one a little less than the other—but still shocking. If I am wrong in my reading of the majority opinion—that is, if the majority claims that neither count is brutal or shocking, or if only one count is brutal or shocking under the *Boscarino* factors—the majority should say so. Once any one of the *Boscarino* factors is established, then we must determine whether it is possible to cure the prejudice with jury instructions and, if so, whether the jury instructions passed muster. In my view, no instruction could cure the prejudice caused by the joinder in this case. And even if it could have, the jury instructions consisting of two sentences; see footnote

In this case, the majority also suggests that the defendant waived his rights because he neither, through a request to charge, urged the court to give more extensive instructions on keeping the counts separate, nor took an exception to the charge on this ground. The majority cites no authority for this unusual claim and it would greatly surprise me if any authority can be found in this or any other jurisdiction to support such a claim. Furthermore, this claim by the majority misconstrues the issue. The error of the trial court is not the failure to give a sufficient instruction to the jury but, rather, the improper joinder of the counts. The improper joinder for trial purposes is not made proper by jury instructions. Rather, it is jury instructions that may, in some cases, make the error harmless. The burden of demonstrating that the error is harmless, if it is possible, should not be placed on the shoulders of the defendant. Nonetheless, the joinder in this case simply could not be cured by a jury instruction because it was too prejudicial. See *State* v. *Boscarino*, supra, 204 Conn. 725.

Finally, the state's suggestion that the evidence supporting one count may have been admitted at a separate trial on the other count totally ignores the evidentiary rule that to be admitted under one of the prior misconduct exceptions, the evidence must meet two requirements: "(1) it must be relevant and material to the exception claimed; and (2) its probative value must outweigh its prejudicial effect." *State* v. *Santiago*, 224 Conn. 325, 338, 618 A.2d 32 (1992). Even if the prior misconduct evidence was relevant or material, the conclusion that the evidence presented in this case is "brutal or shocking" clearly establishes that any probative value is outweighed by its prejudicial effect. Furthermore, it is inconceivable that, under any circumstances, evidence underlying either count would be admissible

11 of this dissent; fall far short of the mark. See *State* v. *Horne*, supra, 215 Conn. 551–53.

in a separate trial on the other count, when the misconduct is based upon purely inferential evidence as it is in this case.[13]

What greatly concerns me is that this result oriented opinion sets a new standard for consolidating trials and that standard can result in grave injustices. It allows the state to introduce highly prejudicial evidence that it would not be able to do otherwise. It sends a message to our trial courts that all joinders will pass muster. Indeed, much to its credit, and unlike the majority of this court, the state conceded at oral argument that this was a "close call."[14] One would never believe that from a reading of the majority opinion.

One "test of the quality of [our] civilization is its treatment of those charged with crime, particularly with offenses which arouse the passions of a community." *Irvin* v. *Dowd*, 366 U.S. 717, 729, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961) (Frankfurter, J., concurring). If in cases such as this the rights of an accused are compromised because of the nature of the crimes with which he is charged, then the quality of our civilization is severely threatened. Unfortunately, in my view, this case fails the test enunciated by Justice Frankfurter.

Accordingly, I would affirm the judgment of the Appellate Court in this case.

---

[13] The state, implicitly recognizing the tenuous position of its claim that none of the *Boscarino* factors were present in this case, focused much of its brief and almost all of its oral argument on the claim that the underlying evidence of one count would have been admissible in a separate trial on the other count on various theories, including prior misconduct evidence. In doing so, the state sought "guidance" from this court with respect to the admissibility of the evidence, pointing out its importance because of the unfortunate proliferation of child abuse cases in Connecticut. As a result of this case, the state need not be concerned about being unable to get this prejudicial evidence before the jury in other cases. By allowing the state to join the two counts of risk of injury and manslaughter, the majority has enabled the state to get through the back door what it could not get through the front door under our rules of evidence. See footnote 3 of this dissent.

[14] See footnote 13 of this dissent.